## In re WEBSTER'S ESTATE.
## WEBSTER et al. v. WEBSTER et al.

No. 11882—Opinion Filed May, 19, 1925.

Dissenting Opinion Jan. 12, 1926. Rehearing Denied Jan. 12, 1926.

(Syllabus.)

### Marriage — Validity — Presumption as to Status After Disability Removed.

When parties in good faith comply with the forms of law which would give rise to their marriage, but for one being under a disability, the law infers that the matrimonial consent was interchanged between them as soon as the disability is removed, and stamps their relation with the status of a valid marriage.

Error from District Court, Okfuskee County; Lucien B. Wright, Judge.

In the matter of the estate of Edward Webster, deceased; determination of heirship. From judgment in favor of Eliza Webster, Hazel Webster and others bring error. Affirmed.

E. T. Noble and S. L. O'Bannon, for plaintiffs in error.

Phillips & Douglass and White & Nichols, for defendants in error.

BRANSON, V. C. J. This cause had its inception in the county court of Okfuskee county. A petition for determination of heirship was filed in conjunction with an administration proceeding of a deceased Creek allottee. One Edward Webster was the said allottee. He died in December, 1918, intestate. At the time of his death, he was the owner of certain real estate, the description of which is unnecessary to set out herein. A decree of heirship was entered in the county court, and therefrom an appeal was taken to the district court of said county. The judgments of the county and district courts reach the same conclusions. each finding that one Eliza Webster, a fullblood Creek citizen, was the sole heir of said decedent.

At the time of the trial in the county court, one Louisa Jimboy, for herself and two minor children, claimed by proper pleadings to be the sole heirs of the said de-

cedent. She testified in the county court, but before the case was tried de novo in the district court she had departed this life, and the cause there was tried after revivor, in name of her heirs, on the same issues as in the county court. The judgment of the district court, which is here for review, was based upon the sole question raised by the pleadings, as to whether Eliza Webster was the lawful wife of the decedent at the time of his death, or whether Louisa Jimboy was his wife. Eliza Webster was first married about 1890, to one Tom Canard, a full-blood Creek Indian. They lived together until 1906, when they separated. In 1907 the decedent obtained a marriage license in accord and with the then existing statute in the Indian Territory, of which the Creek Nation was a part, and entered into a ceremonial marriage with Eliza. They lived together continuously until 1915, and thereafter at intervals, until 1917, when the decedent deserted Eliza and sought conjugal fellowship and satisfaction by living with said Louisa Jimboy, under promises that he, the decedent, would obtain a divorce from Eliza and marry Louisa. While so cohabiting, Louisa gave birth to one child, another being born after the death of Webster, who, with other of her children were the claimants in the district court, when the ear of that court was obtained on the issues between the parties.

A concession is made in the briefs by counsel, of which much is said, but it extended no further than that "neither Tom (Canard) nor Eliza were ever divorced by decree of court." Canard died in 1911. Eliza and the decedent were at that time living together, their ceremonial marriage having been performed in 1907. If Eliza was the lawful wife of the decedent at any time during their cohabitation, the correctness of the judgment of the district court cannot be questioned, for Louisa Jimboy testified that she lived with the decedent, he promising that he would secure a divorce from Eliza and marry her, which promise, if ever intended in good faith, was forestalled by his death.

In considering whether Eliza bore the status of a wife to the decedent, it cannot be considered solely as sentiment to take into consideration that these people were all Indians of the full blood, and that only a few years prior to 1906 had their tribal custom among the Indians of divorce by separation been abrogated by the abolition of all the laws and customs under which these people had their existence and governed their rights. Whether to be frowned on or to be treated as having bearing upon certain elements of

her legal status, may depend upon the individual viewpoint of each of us who are called upon to determine the issues here presented. But to the writer, it seems clear that both Eliza and Tom Canard believed in good faith, whether ignorantly or otherwise, that said so-called "custom" divorce by separation would re-store to each the capacity to enter into a new marital relation, and did so, in a measure with that simplicity which is capable of being appreciated only by those who have come in contact with them and know the method of thinking of the average uneducated full-blood Indian. Tom Canard took unto himself another woman, soon after he left Eliza. The deceased undertook to comply with the new order of things, secured a marriage license, and went through a ceremony, in order to try to make Eliza his wife. The question is, Did he succeed in doing so?

The deceased was capable of entering into the marriage relation in 1907, but Eliza was incapable. It is not conceded in the record, and there is no proof to that effect, that the deceased, Edward Webster, knew that Eliza was under a disability to contract marriage. Eliza's adversary in this proceeding, by her own word of mouth, places in the record before this court that the deceased many times told her that he would have to secure a divorce from Eliza, but would do so, and then marry her. (Louisa). Apparently not even to the day of his death did Edward Webster ever have any conception other than that he was the lawful husband of Eliza; that Eliza and Edward were known and recognized as such, even from the time of their ceremonial marriage in 1907, no other inference can reasonably be drawn. Under these conditions, were they husband and wife?

While marriage is primarily a contract, and is such in so far as it relates to the man and the woman personally, it is something other than that in so far as it relates to them as members of society. As it relates to them as members of society, it is referred to in the law as a "status." In the case of marriage, the law does not concede its impotency to stamp with a status known as marriage a relation which public policy would otherwise frown upon. It is a doctrine of ancient origin that the law presumes that a relation, connubial in it nature, is matrimonial, and not meretricious. This presumption does not extend to the point of undertaking to protect an illicit cohabitation, or to create in one of the parties who attempts to contract marriage a capability of entering into such contract when the

same does not exist, but it does extend to the point that where a marriage is entered into according to the forms of law, and one of the parties is laboring under a disability, or is incapable by reason of a living spouse from whom she has not been divorced from legally contracting marriage, that if this disability ceases, by death or otherwise, the contracting parties continuing to live together ostensibly in the marriage relation, the law stamps such relation as a marriage, from the first moment the disability on the part of one of the parties ceases. That is to say, the law raises the conclusive presumption under such condition, that they had interchanged, each with the other, that personal consent which is the basis of a legal marriage. As one author has said, in effect, the policy of the law is that matrimonial conduct shall be referred to the status of marriage, because it is this status which society takes to itself the right to impose upon such relation, recognizing, however, that while the contract is made by the parties without consulting society, that society should have the correlative right, where a disability exists as to one of the parties, upon the termination of such disability, to impose the status intended without consulting the parties themselves. In other words, the well-recognized rule of public policy is that if at the time of the commencement of their relation their intentions were matrimonial, if either party was incapacitated to enter into a valid contract, the law will not permit the public policy it subserves to be defeated, except during the time the incapacity exists. When the incapacity ceases, the law asserts itself, for the benefit of society, and stamps the relation of the parties as that of marriage.

Appellants seem to contend that the exchange of matrimonial consent between these parties must be referred solely to the hour of the ceremonial marriage. but in making this contention they overlook the universally recognized wholesome doctrine that where the so-called common-law marriage exists, the law will infer consent to have been given at the earliest moment the law finds each of the parties capable of interchanging such consent. In fact, there is no foundation in right reason for the contention that the matrimonial consent necessary to create the status of marriage must be referred to the commencement of the cohabitation solely, or to any other particular point of time. The cohabitation continued or holding each other out to the community as occupying the status of husband and wife warrants no other conclusion than that the parties had, either

by word of mouth or by action, thoroughly understood by each other, entered into the agreement to be husband and wife.

The district court, in its judgment, among other things, found as a fact that the ceremonial marriage between the deceased and Eliza was consummated in good faith on the part of both the deceased and Eliza.

In the English case of De Thoren v. The Attorney General et al., First Appeal Cases (L. R.) 686, Lord Chelmsford said:

"The question to be determined is whether there was a consent to a marriage between William Ellis Wall and Sarah Ogg, evidenced by habit and repute, prior to the birth of the elder of the sons. If there were no other question than this in the case there would be no difficulty in giving an answer in the affirmative. But the appellant, though he admits that there had been such cohabitation of the parties as husband and wife as in an ordinary case would have conclusively established the presumption of a marriage by consent, yet contends that the circumstances of the previous ceremony of marriage having taken place between the parties, which was invalid, though unknown to them to be so, prevented that presumption. The ground of this argument is that the living together of the parties as husband and wife must be attributed to the invalid ceremony, and therefore that the habit and repute could not be evidence of any other consent. * * *

"A marriage is established by habit and repute on the ground that the cohabitation as husband and wife is proof that the parties have consented to contract the relation. **If any legal impediment exists** to prevent their marrying, as long as it continues no presumption of consent can arise. But if the cohabitation begins in an illicit intercourse, and is continued after the bar to marriage (whatever it may be) is known to be removed, habit and repute may have their proper operation upon the continuing cohabitation, which is not to be referred to the original intercourse."

In the syllabus in said case, the law is stated on the proposition just above set forth:

"It must be inferred that the matrimonial consent was interchanged as soon as the parties were enabled by the removal of the impediment to enter into the contract."

There are three outstanding propositions determined by said case, which find sanction in the well-reasoned American cases recognizing the validity of common-law marriages. They are, in effect, that the subsequent cohabitation was not dependent for its efficacy in creating marriage upon the inefficiency of ceremony; that where the parties are cohabiting with matrimonial inten-

tions, but it is without sanction of law, because one is under an impediment, matrimonial consent must be presumed to have been interchanged as soon as the parties were capable by the removal of the impediment; and that the ceremony, although invalid to effectuate a legal marriage, was a consent by the parties to a cohabitation which was matrimonial in character, and as soon as the impediment is removed, by death or otherwise, their continued cohabitation creates a conclusive presumption of mutual consent thereto.

Bishop, in his well-known work on Marriage, Divorce and Separation, announces the same propositions as a general rule, and in general language as follows:

"If the parties desire marriage, and do what they can to render their union matrimonial, though one is under a disability, their cohabitation, thus matrimonially meant, will in matter of law make them husband and wife, from the moment when the disability is removed." 1 Bishop, Marriage, Divorce, and Separation, secs. 970, 975, 976; Teter v. Teter, 101 Ind. 129; Poole v. People (Colo.) 52 Pac. 1025.

In the last cited case the Supreme Court of Colorado said:

"Where a man and woman who were regularly married while one of them was under a disability to marry, nevertheless lived together as husband and wife, after the disability is removed, it makes them husband and wife, as effectively as though the relation had first been legally assumed."

We affirm the judgment of the district court.

NICHOLSON, C. J., and LESTER, HUNT, CLARK, and RILEY, JJ., concur. MASON and PHELPS, JJ., dissent. HARRISON, J., absent and not participating.

Note.—See under (1) 26 Cyc. p. 867; anno. 3 L. R. A. (N. S.) 244; L. R. A. 1915E, 91; 18 R. C. L. pp. 436, 437; 3 R. C. L. Supp. 813; 4 R. C. L. Supp. 1186.

---

PHELPS, J. (dissenting). Tom Canard and Eliza Canard were married about the year 1890, and continued to live together as husband and wife until about 1907. Then Eliza abandoned her husband and commenced to live with Edward Webster; they procured a marriage license and had a purported marriage ceremony performed. Soon thereafter, Tom Canard commenced to live with Melissa Canard. No divorce proceedings were had between Tom and Eliza. Tom Canard while living with Melissa died n the year 1911. In a suit between Eliza and Melissa as to the ownership of the allotment of Tom Canard, Eliza testified that she was the wife of Tom Canard, deceased, and in the proceedings still retained his name. Edward Webster was living with Eliza at the time of the death of Tom Canard. Eliza testified in the declaration of heirship proceedings that Edward Webster went away and came back to live with her at irregular intervals between the years 1911 and 1915. She also testified that she knew it was not right to live with Edward, but that she did so because he wanted her to. In July, 1915, Edward finally left the home of Eliza. After leaving the home of Eliza, Edward stated he was going to marry Louisa Jimboy, and they commenced to live together and held themselves out in the community as husband and wife. The couple attended camp meetings in the neighborhood, where all the parties involved in this case lived, passing themselves as husband and wife, and occupying the same tent. Two children, Hazel and Edward Lee, were born to Louisa and Edward. The parties had been living together about one year when Hazel was born. No formal marriage ceremony was had between the parties. Louisa testified that Edward advised her that they would later secure a marriage license and have a regular marriage ceremony performed. The separation of Tom Canard and Eliza and their attempted marriage with other parties did not amount to a divorce or legal separation under the law as it then existed. Butler v. Wilson, 54 Okla. 229, 153 Pac. 825; Palmer v. Cully, 52 Okla. 465, 153 Pac. 154.

As Eliza had a living husband at the time of the attempted marriage between her and Edward, such attempted marriage was a nullity, and the continued cohabitation thereafter was bigamous and criminal. Eliza relies alone on the cohabitation as shown between her and Edward Webster after the death of Tom Canard to establish a marriage between them. There is no testimony offered by her indicating or expressing any intention between her and Edward Webster to establish the marriage relation between them after the death of Tom Canard, the husband of Eliza. The fact that these parties continued to live together at irregular intervals from 1911, the date of the death of Eliza's husband, to July, 1915, will not support the resumption that such cohabitation was intended to constitute a marriage between the parties after the death of her husband. The want of expression on the part of Eliza and Edward of intentions to establish the marriage relation, coupled with the announced purpose of Edward to marry Louisa, and the following up of the declaration by commencing to live with her,

and holding her out in the community as his wife, and continuing to so live with her until his death, precludes the presumption that the marriage relation arose between Edward and Eliza.

In Clark v. Barney, 24 Okla. 455, 103 Pac. 598, in the syllabus thereof, this court said:

"A marriage contracted by two parties, one of whom had a living, undivorced spouse which was known by both parties to the alleged marriage contract, which was bigamous and criminal in its inception, the undivorced spouse dying shortly after such bigamous marriage, and said relations continuing thereafter, without any apparent change until the death of one of the parties thereto, there is no presumption of change of relations, and without more such could not ripen into a common-law marriage."

In the body of the opinion the court, speaking through Mr. Justice Williams, made use of the following language:

"Whilst it is the policy of the law to encourage legitimacy, yet, in order to do so, it will not encourage licentiousness. This relation, in its inception being bigamou and adulterous, after the death of the said Margaret Barney there is no presumption of a change of relation, and if there was such a change it must expressly appear by proof, to place the parties in the eyes of the law in a lawful relation. Common-law marriage grows out of good faith, honest intentions, and proper purposes, and if willful bigamous relations, after the death of the party who has been wronged by the other spouse, are to ripen per se by the continuance of such cohabitation, without any perceptible change in the manner of such relations, into a common-law marriage in order to put the seal of legitimacy upon such cohabitation, it would tend to put a premium upon the disregard of marital relations."

Therefore, when Eliza deserted her husband and small children and entered into an adulterous relation with Edward Webster, we cannot, even by the greatest possible stretch of the imagination, reach the conclusion that she was actuated by "good faith, honest intentions, or proper purposes," especially in view of the fact that she retained the name of her former husband, Tom Canard, and laid claim to a portion of his estate as his wife. We hesitate to place the stamp of approval upon such relations as the record discloses existed between either Edward and Eliza or Edward and Louisa. Clearly, to our mind, the record does not disclose a state of facts which justifies us in reaching the conclusion, as measured by the rules laid down in former opinion of this court, that Edward and Eliza were common-law husband and wife. The record discloses, however, that Louisa bore two children by

Edward; that they occupied the relation of husband and wife, and that he died at her home and we hesitate to brand the children of Louisa and Edward as bastards and allow his estate to go to Eliza instead of to his children, even though Louisa's relations with Edward may have been as reprehensible as were those of Eliza.

As no marriage relation existed between Edward and Eliza at the time of his final abandonment of Eliza in 1915, he was free to contract a valid marriage with Louisa, and if it can be said that Edward's estate should be disposed of upon the so-called common-law marriage theory, the acts and conduct between Edward and Louisa were sufficient to constitute a common-law marriage. In re Love's Estate, 42 Okla. 478, 142 Pac. 305; Palmer v. Cully (supra); Sanders v. Sanders, 67 Okla. 3, 168 Pac. 197.