BURDINE v. BURDINE.

No. 34891. March 18, 1952.

*242 P. 2d 148.*

O. B. Martin, Oklahoma City, for plaintiff in error.

Hunt, Johnson & Fore, Oklahoma City, for defendant in error.

GIBSON, J. In this opinion the parties will be designated as they appeared in the trial court. Plaintiff in error was defendant.

Plaintiff filed her petition in this divorce action, alleging that she and defendant entered into a verbal agreement to become husband and wife, and that such agreement was consummated by cohabitation and mutual assumption of marital duties and obligations, and that such relations were maintained by the parties in good faith; that they held themselves out to the public as man and wife and were so recognized in the community by their relatives, friends and associates. It was further alleged that during said marriage a child was born. Abandonment was alleged as ground for divorce, and the prayer was for a divorce, custody and support of the child, costs and attorney's fees. An affidavit in forma pauperis was filed with the petition.

Issue was joined by defendant's answer and, following a trial, judgment was rendered granting plaintiff a divorce, custody of the child and the sum of $17.50 on the 7th and 22nd of each calendar month thereafter until the child reached its majority. Costs and fees for plaintiff's attorneys were assessed against defendant. From this judgment defendant appeals.

On June 22, 1940, defendant married one Leona Ferguson in New Mexico. She was a resident of Colorado and continued her residence in that state. Defendant was in military service and was assigned to various military posts. In October, 1941, while stationed at Oklahoma City, defendant induced plaintiff to enter into what she believed to be a common-law marriage. They resided in an apartment in Oklahoma City, where they lived openly as man and wife. He gave her an engagement ring and later a wedding ring.

In the fall of 1942, being pregnant, plaintiff went to the home of her mothers in Antlers, Oklahoma, where a child was born in October. During her stay in Antlers defendant sent plaintiff some money and wrote letters expressing great affection, containing promises as to what he proposed doing to make plaintiff proud of him as her husband. In one letter he stated that after their child was born "We will have something to fight for and live for."

In her brief plaintiff stresses the evidence showing that in 1942, without plaintiff's knowledge, the defendant married a third woman and in 1948 he married a fourth. These marriages have no bearing on solution of our problem presented by this appeal.

On January 6, 1943, defendant's first wife obtained a divorce in Colorado on grounds of nonsupport.

Plaintiff did not return to Oklahoma City until February, 1943. Defendant was then stationed at Will Rogers field. He called plaintiff on the phone and advised her that he was being shipped out. He left and was stationed at Topeka, Kansas. He continued writing letters to plaintiff, addressed to "Mrs. O. L. Burdine". Such letters contained many promises and recognized plaintiff as his wife and the child as his own.

In the judgment rendered the court made the following finding:

"That prior to January 6, 1943, under the law of this State, there could be no

common-law marriage between the plaintiff and defendant in this action because the defendant up until that date had a living wife from whom he was not divorced, but such impediment was removed on January 6, 1943, and there was sufficient acts and conduct between the parties to this action occurring thereafter to constitute a common law marriage, and the defendant is herein estopped from asserting the invalidity of such common law marriage under the evidence in this case."

In the decree the court declared defendant to be the father of the child and awarded child support as above set forth.

In his appeal defendant says that the order is void and that the trial court had no authority to order payment of child support and attorney's fees but had only the power to grant annulment of the common-law marriage.

These same contentions were urged by a defendant husband in Hess v. Hess, 198 Okla. 130, 176 P. 2d 804, wherein this court said:

"The removal of a legal impediment to marriage while parties continue to live together as husband and wife gives rise to a 'common-law marriage,' even though one or both of the parties knew of the impediment."

In the Hess case both parties had knowledge of the existing impediment to their marriage, but in the instant case there is ample evidence showing that plaintiff did not know that defendant had a living wife in Colorado. Here the evidence shows that plaintiff was in good faith in all her marital relations with defendant.

In Mantz v. Gill, 147 Okla. 199, 296 P. 441, we said:

"Where a second marriage is entered into in good faith, and the parties continue to cohabit without change during and beyond the statutory six months period of impediment, this relationship ripens into a common-law marriage. Such marriage is recognized as valid in this state by our court. Andrews v. Hooper, 138 Okla. 104, 280 P. 424; Mudd

v. Perry, 108 Okla. 168, 235 P. 479; Fisher v. Fisher, 116 Okla. 129, 243 P. 730.

"The recent decisions of our court have been very liberal in construing marital relationship where the same was entered into in good faith. In the case of Andrews v. Hooper, supra, the court states:

" 'This court has always been very liberal in the construction of marriage laws where same are entered into in good faith. Regardless of statute, common law marriages have been upheld, marriages of persons under age have been held voidable, not void, and marriages in good faith, while under disability, have been held to ripen into legitimate relations when impediments are removed. Good faith, while not controlling, is always one of the principal elements to be considered.' "

And in Webster v. Webster, 114 Okla. 57, 242 P. 555, we held:

"When parties in good faith comply with the forms of law which would give rise to their marriage, but for one being under a disability, the law infers that the matrimonial consent was interchanged between them as soon as the disability is removed, and stamps their relation with the status of a valid marriage."

It is true that in many of the cases cited on the subject of status after removal of the impediment to marriage, there was an actual continual cohabitation or living together under the same roof, while in the instant case the parties, by reason of the emergency of war, were separated. We, then, are concerned with the events occurring after January 6, 1943, when the impediment to a legal marriage, common-law or civil, was removed by the Colorado divorce obtained by defendant's first wife. The acts and conduct of the parties must have been sufficient to establish a common-law marriage relation as having been agreed to and mutually continued, after that date. The trial court held this relation to have been established by the evidence.

In Webster v. Webster, supra, we quoted Bishop on Marriage, Divorce and Separation, as follows:

" 'If the parties desire marriage, and do what they can to render their union matrimonial, though one is under a disability, their cohabitation thus matrimonially meant, will in matter of law make them husband and wife, from the moment when the disability is removed.' 1 Bishop, Marriage and Divorce, secs. 970, 975, 976; Teter v. Teter, 101 Ind. 129, 51 Am. Rep. 742; Poole v. People, 24 Colo. 510, 52 P. 1025, 65 Am. St. Rep. 245."

Bouvier's Law Dictionary, vol. 1, defines "cohabitation", saying:

"It does not necessarily mean living together under the same roof; a man may be absent on business, or two domestic servants may live with different employers, and yet be cohabiting in the broader sense."

In this day of international violence we have many married men serving overseas with the armed forces. Their terms of service are indefinite. But where, in good faith, the parties intend and do continue their status as man and wife, it would not be said that they are not cohabiting together, or that the marriage relation no longer exists because of the enforced separation of the parties. In the case before us the parties were separated, after January 6, 1943, because defendant was in military service. But the residence of the parties was Oklahoma City. We must look to the intent and conduct of the parties, after said date, in deciding whether the common-law marriage relation continued to exist. Of necessity, their communications were by correspondence. In his letters, addressed to plaintiff as "Mrs. O. L. Burdine", for months following the removal of the impediment, defendant recognized plaintiff as his wife and as the mother of his child. He was advising plaintiff of plans for their future and assuring her that everything would work out for the best. While stationed in the Pacific, in 1944, defendant was concerned about his child and requested a picture, which plaintiff sent to him. It was only after defendant was discharged from the service and returned to his home that defendant demonstrated that he no longer cared for the wife or child and abandoned them.

The trial court held that under the evidence the defendant was estopped from asserting the invalidity of the common-law marriage relationship. In this the court was sustained by authority of Mantz v. Gill, supra, where we held that there was such an estoppel under similar facts.

In his brief defendant places sole reliance upon Whitney v. Whitney, 192 Okla. 174, 134 P. 2d 357, and Kirk v. Kirk, 205 Okla. 482, 238 P. 2d 808. Neither case is in point. In both cases a divorce action was filed by one party who had never been legally married to the other and in both cases one party had a living spouse and was not divorced. In the present case, the common-law marriage, at its inception, was illegal, but with the removal of the impediment the marriage became validated by the conduct of the parties and their consenting minds. This has been held to be true even though the parties did not dwell under the same roof, after removal of the impediment. Sturm v. Sturm, 111 N. J. Eq. 579, 163 Atl. 5.

This action is a suit over money. To avoid payment of support money for a child, admittedly his child, defendant would brand the child as illegitimate and would declare his life with plaintiff to be a life of adultery. In James v. James, 131 Okla. 276, 268 P. 726, we held the argument of one in a similar situation to be without support of equity, good morals, law or sound logic.

Plaintiff has filed verified application for allowance of attorney's fees for services rendered in this court on the appeal. She has shown that she is without funds to employ counsel. Defendant prosecuted this appeal compelling plaintiff to defend her judgment. The amount prayed is reasonable.

It is ordered that plaintiff be given judgment against defendant for $250 attorney's fee, in addition to the judgment of the trial court.

Judgment affirmed.

WELCH, CORN, DAVISON, JOHNSON, O'NEAL, and BINGAMAN, JJ., concur.