**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Gene EATON et al.,
Defendants-Appellants.**

**Nos. 73–1138 to 73–1140.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 13, 1973.

Decided Oct. 2, 1973.

Rehearing Denied in Nos. 73–1139, 73–1140
Oct. 26, 1973.

**104**

Milton Keen, Oklahoma City, for defendants-appellants Eaton and Anderson.

Oyler & Smith, Oklahoma City, for defendant-appellant Fletcher.

William R. Burkett, U. S. Atty., Oklahoma City, for plaintiff-appellee.

Before LEWIS, BARNES,* and Mc-WILLIAMS, Circuit Judges.

BARNES, Circuit Judge:

This is a combined appeal by three individuals, two convicted of armed bank robbery (Anderson and Eaton—18 U.S.C. § 2113(a) and (d)); and one of being an accessory after the fact (Fletcher—18 U.S.C. § 3) by aiding or preventing apprehension of the other two appellants.

The facts need not be reported in detail, as no point is made of the insufficiency of the evidence, except as to appellant Fletcher. Viewing the evidence in a light most favorable to the government, as we must on this appeal, the evidence is clearly sufficient to convict two defendants, provided the various alleged evidentiary and procedural matters raised on this appeal are without merit.[1] We do find them without merit, and affirm the convictions of Anderson and Eaton, but reverse the conviction of Fletcher.

We discuss each issue raised below, after numbering them.

All defendants raise one issue in common: I., the alleged improper examination of witness Sherry (Sherri) Owings (alleged to have been Eaton's common law wife).

The defendants Anderson and Eaton each raise II., the incompetency as a witness of said Sherry Owings, and III., the error in denying a motion for severance.

Defendant Anderson raises, alone, IV., the court's denial of his counsel's motion for a continuance; and V., the court's denial of a motion for a mistrial when a witness for the prosecution, under cross-examination by counsel for Anderson, mentioned that Anderson was on parole.

Defendant Fletcher claims VI., the trial judge erred in denying him a bill of particulars, and VII., asserts the insufficiency of the evidence to sustain the verdict against him.

## I. CROSS-EXAMINATION OF A HOSTILE WITNESS.

It is hornbook law that if a party's own witness (a) surprises him, by (b) testifying materially differently from a prior statement, which differing testimony (c) damages the calling party's case, then the calling party's counsel may cross-examine his hostile witness;

* Honorable Stanley N. Barnes of the Ninth Circuit, sitting by designation.

1. The use of stolen "bait-money" by Eaton to purchase a Buick car for $4,350 cash the day after the robbery was a particularly damning bit of evidence, as were the seriatim numbers of bills previously sold to the bank, and stolen in the armed bank robbery and found in the Mustang owned by Fletcher, which Anderson was driving. When arrested with the stolen money in the auto, Anderson gave police a false name and never explained why.

ask the witness whether or not he made the prior inconsistent statement; and if so, if the witness desires to explain it. Such prior statements are admissible only to impeach or discredit the witness, and are not competent substantive evidence of the facts to which the former statements relate. Brooks v. United States, 309 F.2d 580 (10th Cir. 1962). But if on cross-examination the witness admits the former contradictory statements were made, no further proof is necessary. Ditrich v. United States, 243 F.2d 729 (10th Cir. 1957). Here there was no clear repudiation by the hostile witness Sherry Owings, of her prior statements made before trial. Bushaw v. United States, 353 F.2d 477 (9th Cir. 1965); Doss v. United States, 431 F.2d 601 (9th Cir. 1970).

■ After being called by the prosecution, Sherry Owings stated she did not desire to testify. Questions asked by the prosecution established that she was a hostile, evasive witness. The court remarked that ". . . It's obvious to everyone (she) is very hesitant and reluctant." (Tr. at 112), and "obviously hostile" (Tr. at 116). The court granted the prosecution permission, without objection, to treat her as a hostile witness, and lead her as on cross-examination (Tr. at 109).

We note that Mrs. Owings had not repudiated her statements made to the F.B.I. prior to trial. In testifying she continued to be evasive. But when asked if she had told the F.B.I. that articles had been thrown out of the auto in which she and Eaton (with Anderson and his wife) had been riding (after discovering the F.B.I. had been making inquiries at a night club with respect to Eaton and Anderson, in the early morning hours of the day after the armed robbery), she testified:

"A I might have (said that) then; I don't remember saying that.

"Q And you don't remember now what might have been thrown out of the car?

"A I saw something being thrown out of the car, but I don't know what it was."

She was evasive about having seen shot-guns being transferred from one car to another (Tr. 116–117) and whether she talked to Fletcher on the phone the next day. In fact, in at least three instances she originally "failed to remember", but subsequently confirmed the fact she had talked to F.B.I. agents with respect to the subject matter of the questions originally asked her. Cf. United States v. Barrow (D.C.Pa.1964), 229 F.Supp. 722, aff'd. 363 F.2d 62, cert. denied 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541.

The ruling by the court that she was a hostile witness was completely justified.

## II. THE ALLEGED INCOMPETENCY OF THE WITNESS OWINGS.

Sherry Owings' testimony was objected to by Eaton upon the ground that she was his common law wife. The trial judge excused the jury, heard arguments, and ruled that she was not the common law wife of Eaton.

This witness first met Eaton in June, 1972. The bank robbery occurred October 5, 1972. Prior to meeting Eaton, the witness had been married to Clarence Owings, and was divorced by him in Portland, Oregon on March 12, 1972. She married another man on June 7, 1972, and had that marriage assertedly annulled on June 30, 1972.

■ While the Oklahoma statutes apparently require a formal ceremony to contract a marriage (43 Okl.Stat.Ann. § 7 (1961)), case law in that state indicates there must be *"direct evidence* of a *contract"* between the parties "sufficient to give rise to a marital relation." (Emphasis added.) Rainey v. Thomas, 203 Okl. 401, 222 P.2d 510 (1950). In that case the Supreme Court said: ". . . the only indirect evidence thereof is admissions of deceased and acts of cohabitation. . . . The cohabitation relied on was irregular and

for a limited period of time and does not afford cogent evidence of the contract and is entirely insufficient to give rise to a presumption of the existence of a marital status. Richard v. Richard, 172 Okl. 397, 45 P.2d 101."

■ Here, the period of time was certainly limited.[2] The witness testified Eaton had introduced her to his mother as his wife; and to friends (including Anderson) as "his old lady". She and Eaton registered at motels as husband and wife. Defendant Eaton and Mrs. Owings allegedly "planned to be married *in the future*," but "didn't talk about it."

"A common law marriage is contractual and must be founded upon a mutual consent between the parties . . . We can only conclude from the evidence presented in the present case that the deceased and the plaintiff intended and planned to marry at some future date. However, the mere contemplation of marriage does not establish a common law marriage. A common law marriage is based on a present assumption of an existing relationship, not upon what the parties intended or have agreed to do at a future time." In re Est. of Hornback, 475 P.2d 184 (Okl.1970).

"The burden is upon the person relying upon a common law marriage to establish the same. The judgment of a trial court against the claim of the consummation of a common-law marriage will not be reversed where it appears that the evidence does not preponderate in favor of such claim." Jackson v. Jackson, 182 Okl. 74, 76, 76 P.2d 1062, 1063 (1938).

This well established rule is peculiarly apposite because the trial judge has the advantage over appellate judges in observing the conduct and demeanor of the witness; in considering his or her evident disinclination to be an honest witness; or apparent bias, and prejudice. "Good faith, while not controlling, is always one of the principal elements to be considered." Burdine v. Burdine, 206 Okl. 170, 242 P.2d 148 at 150 (1952).

It was likewise the proper role of the trial judge to consider that Sherry Owings never held herself out as Sherry *Eaton*; that she testified she and Eaton "didn't really talk about 'their relationship,' . . . it was just natural, we were together and I was his old lady and that was it"—that *they were going to have to make it legal*; and that "*they planned to get married later* for the children." (Emphasis added.)

The trial court, as finder of the facts under the above quoted law, was justified in finding that defendant Eaton had not sustained the defendant's burden of proving a common law marriage, or any other marriage between himself and Sherry Owings. And it is doubtful if Anderson has standing to ever raise the question. *See* 8 Wigmore, § 2228 (1961 Ed.).

## III. THE MOTIONS OF EATON AND ANDERSON TO SEVER.

■ The granting or refusal of such a motion lies within the sound discretion of the trial court. It is error only when that discretion has been abused. United States v. Rodgers, 419 F.2d 1315, 1317–1318 (10th Cir. 1969), and cases cited therein.

Defendant Anderson had been arrested on other charges in Norman, Oklahoma on August 25, 1972, and was in jail thereafter for two or three weeks. (R.T. at 93, line 20.) Thus, two and one half months (not including his two or three weeks in jail) was the period during which proof of her marital relations with Owings might be established. During this period she never used the name Eaton or signed any papers in that name.

2. Sherry Owings did not meet the defendant Eaton until at least 2½ months after her divorce from Owings on March 12, 1972 was granted. Her divorce was not final until 60 days after it was granted. (§ 107.115(1), Or.Rev.Stats.) She spent another month as the wife of an unnamed person from whom she obtained an annulment. She met Anderson about June 30th, 1902, and started to live with him two weeks later.

Here, the motion for severance was made prior to the trial. There was no reason for it then. The two complaining defendants were indicted on facts arising out of one armed bank robbery occurring on October 5, 1972, in which each of the two allegedly participated.

■ Eaton maintains he was prejudiced when a government witness referred to Anderson as being "on parole". (Tr. Vol. III, at 156). Anderson maintains he was prejudiced when government witness proved that Eaton bought a car with a portion of the stolen money. Anderson was prejudiced only as he would be if any testimony hurt his case, and Anderson's claim of error is entirely without merit.

Eaton's claim has slightly more basis, but was not prejudicial within Rule 14, Fed.R.Cr.Proc. The prosecution did not bring the fact of parole out: it was brought out by counsel for co-defendant Anderson on cross-examination. And see V., *post*.

## IV. ANDERSON'S MOTION FOR A CONTINUANCE OF TRIAL.

■ On October 5, 1972, a bank was robbed. Two days later Anderson and Eaton were arrested. On October 10, 1972 they were released on bail. On October 16, 1972, defendant Anderson, represented by counsel, had a preliminary hearing before a magistrate. An indictment was filed, November 22, 1972. An arraignment took place on November 28, 1972. On that date, attorneys Oyler and Smith entered a written appearance for defendants Anderson and Fletcher. Two days later Oyler and Smith withdrew as Anderson's attorneys. Thereafter, defendants Fletcher and Eaton made various motions, which were denied.

On December 12, 1972, new counsel (Milton Keen) was appointed to represent Anderson. On December 18, 1972 trial was to commence. Mr. Keen asked for a continuance, alleging inability to prepare for trial, and the necessity of going to a funeral on December 19, 1972. The trial judge denied a continuance, but granted Anderson's motion that he be deemed to have made the same motions as the other defendants had made where applicable. Thus Anderson's record was saved. The court also recessed for the entire day of December 19, 1972, so that Mr. Keen could attend his funeral.

During trial, all trial counsel executed a document stating that "full compliance" had been made by the government of all orders entered re discovery. (Tr. Vol. I, at 196; Vol. II, at 74).

Neither prior to trial, during trial, nor on this appeal, has appellant Anderson's counsel attempted to show how his client was injured by the trial court's refusal to delay the trial. He cites cases to show that denying one day's delay is an abuse of discretion; that thirteen days is not, and that therefore the rule must be between 1 and 13 days—"that denial of less than 6 days is abusive."

Nowhere is it charged that Anderson's counsel could not do between December 12 to December 18 what he asks us to presume he could have done in six days after December 18th.

No abuse of discretion and no prejudice is demonstrated. We hold there was no error. *Cf.* United States v. Harris, 441 F.2d 1333, 1335 (10th Cir. 1971).

## V. STATEMENT RE ANDERSON "ON PAROLE".

We have touched upon this in Part III, above. We only add that no *immediate* motion for a mistrial was made on behalf of any defendant, when the evidence was given by one Knoles, nor was any objection asserted; nor was there any motion to strike made prior to the witness leaving the stand. There was no request for the Court to admonish the jury with respect to anything the witness Knoles had stated.

■ The proper procedure required in this Circuit when an incident such as this occurs (if we assume it *was* prejudicial to Anderson), is set forth in McBride v. United States, 409 F.2d 1046

(10th Cir. 1969). That case holds (1) A motion to strike should be made; (2) the witness should be admonished not to volunteer statements (if he had here done so—which is questionable in view of the breadth of Mr. Keen's questions); and (3) the jury should be admonished to disregard the objectionable statement.

There is here not the slightest suggestion that the prosecution in any way attempted to get any reference to Anderson's parole into evidence. There was no reason or way for the prosecutor to avoid the problem created by his opponents. This situation required a split-second decision on trial strategy on the part of three defense attorneys in the court-room—but none on the part of the prosecutor.

■■■■ A delayed motion for a mistrial was not the proper remedy. As in United States v. DeCarlo, 446 F.2d 883, 884, (9th Cir. 1971), we do not think the "blurted out" reference to parole is a point that "amounts to much." The evidence as to Eaton and Anderson overwhelmingly demonstrated their guilt.[3]

## VI. ERROR IN DENYING FLETCHER A BILL OF PARTICULARS.

■■■■ Again, this matter is one for the trial court's exercise of a sound judicial discretion. *Cf.* "The court *may* . . .". (Rule 7(f) Fed.R.Cr.Proc.) United States v. Gleeson, 411 F.2d 1091, 1094 (10th Cir. 1969); King v. United States, 402 F.2d 289 (10th Cir. 1968); Cefalu v. United States, 234 F.2d 522 (10th Cir. 1956).

■■■■ There is no showing of surprise or prejudice to Fletcher for lack of a Bill of Particulars. The indictment gave Fletcher the date and place of the armed robbery, the names of the persons he allegedly aided, the offense they had committed, and charged him, in the words of the statute, with being an accessory after the fact. This denial of a Bill of Particulars was not error.

## VII. LASTLY, WE REACH THE SUFFICIENCY OF THE EVIDENCE TO CONVICT FLETCHER.

This is the only really difficult issue in this combined appeal. As the trial judge said, "I am ready to concede it's very, very close, Mr. Oyler, very close." (R.T., Vol. II at 3).

The government was required to prove three elements against Fletcher, accused of being an accessory after the fact:

*First*: That the Bank of Verden was robbed;

*Second*: That Fletcher knew that Eaton and Anderson participated in the robbery; and

*Third*: That with such knowledge, he in some way assisted them in order to hinder or prevent their apprehension, trial, or punishment.

The *first* was established clearly by uncontradicted evidence.

While there might exist an inference or supposition that Fletcher *knew* or *suspected* his friends knew about the robbery, the *second* and *third* elements simply do not exist in the record before us—either by a preponderance of the evidence, or most assuredly, "not beyond a reasonable doubt."

---

3. In this case, the bank officer from whom the money was taken identified Anderson and Eaton (Tr. at 21); one of the bank employees present during the robbery also identified them (Tr. at 54); they were together before and after the robbery (Tr. at 102–104; 132–135; 160–170; 285, 302–303); the automobile belonging to Eaton was like the one driven by the robbers (Tr. at 77–78, 202; Plaintiff's Ex. 17, Tr. at 205); Eaton purchased a car the next day with money from the robbery using a false name and address (Tr. at 180–196); and Anderson was arrested two days later in possession of money from the robbery and gave the officers a false name at the time. (Tr. at 206–227.) Sawed-off shot-guns were used in the hold-up. Eaton showed Mrs. Knoles one sawed-off shot-gun, and told her of another, carried in a sack in the back seat of the car these defendants used; the rope possessed by the defendants and found with their discarded clothes which they endeavored to dispose of, matched the rope used to tie up the victims of the robbery.

It can be *inferred* that *perhaps* Fletcher knew that Eaton and Anderson "pulled" the Verden job; that *probably* Fletcher was at Spankie's when the other two defendants heard that the F.B.I. were looking for them (otherwise why would he have shown up at the Knoles' yard later to permit a transfer of the clothes and weapons from the defendant's car· elsewhere.) But he *might* have heard from the bartender or barmaid that the F.B.I. wanted Eaton and Anderson, after Eaton and Anderson had left the Spankie premises so hurriedly. There were but five or six other patrons in the bar at the time, and the exit described in the transcript would hardly go unnoticed by those present in such limited numbers.

We have read with great care the entire transcript of this case, and particularly the testimony of the hostile government witness, Sherry Owings,[4] with respect to identifying Fletcher.

 We can conjecture, and guess, and surmise, that Fletcher was present at both Spankie's and Knoles', and that he aided and abetted the defendants. Yet, we cannot say his guilt was proved on the last two issues beyond all reasonable doubt.

We affirm the judgment of conviction as to Eaton and Anderson: we reverse the conviction of Fletcher.

Reversed and affirmed.

---

4. After the day of the robbery, October 5, 1972, according to Sherry Owings, she and Billy Anderson, and Mr. and Mrs. Eaton, after dinner, went to a tavern or bar called "Spankie's" in Oklahoma City. Sherry Owings, who did not know defendant Fletcher, saw Eaton talk to a man whom the witness "thought" was Fletcher.

"Q Did you see Mr. Fletcher in the Club that night?

"A It was dark, I think it was him,. I'm not sure." (Tr. at 109, lines 1 and 2.)

Someone said (in the presence of a defendant), "The F.B.I. was looking for them." (Tr. at 109), that is, looking for "Billy" (Anderson) and "Harold" (Eaton). (Tr. at 110.) The two couples left hurriedly and went to the Knoles' apartment. On the way there, "something" was thrown out of the car. (Tr. at 110.) At the Knoles' the defendants and Mrs. Owings took clothes out of the car, and into the Knoles' apartment. Shortly thereafter a blue car drove up, with several people in it. One looked like Fletcher, but Mrs. Owings "wasn't sure" it was he. She told the F.B.I. that Fletcher was present with another blonde bail bondsman in the blue car at 2 :00 a. m. on November 6, 1973, but that "I couldn't tell for sure."

(Tr. at 116.) She had previously seen Fletcher in his office prior to October 5, 1973 (Tr. at 116.) She saw people transferring "things" from one car to another.

Mrs. Owings also saw a gun in the trunk of Eaton's car, 12 inches long, tape around the handle. She couldn't say if it was a double barrelled shot-gun. (Tr. at 117.) She saw one or two *handles*, but only one thing that "shown" (sic, shone). (Tr. at 118.)

Later, on October 6, 1972, she talked to Fletcher on the phone ("I think it was Fletcher; I asked for Fletcher. I assumed it was Fletcher.") "I asked how Billy was, if he was alright."

Mrs. Knoles testified that on the trip of the three couples to Spankie's on October 5, 1972, Harold Anderson had showed her a double handled-shot-gun, carried in the back seat in a bag; and told her a second shot gun, same size, was in the same bag. (Tr. at 169.)

Mrs. Knoles saw the transfer of "things" (largely clothing) from one auto to another in the early hours of October 6, 1972, but did not testify whether or not Fletcher participated in such transfer, because she was not asked.