In the Matter of the Estate of Chester A. Dowell, Deceased.

Chester Ralph DOWELL, Appellant,

v.

Orpha WELCH, Appellee.

No. 50446.

Court of Appeals of Oklahoma, Division 2.

Jan. 3, 1978.

Released for Publication by Order of Court of Appeals Jan. 26, 1978.

Ray A. Johnston, Wilburton, and James E. Gotcher, McAlester, for appellant.

William G. Jones, Wilburton, for appellee.

BRIGHTMIRE, Presiding Judge.

Was appellee, Orpha Welch, the paramour or common-law wife of the late Chester A. Dowell when he died April 8, 1976? Decedent's son, Chester Ralph Dowell, says she was no more than an intimate friend. The court who heard the evidence found, however, that she was the senior Dowell's surviving spouse. We affirm.

### I

Orpha's husband of several years died on June 15, 1975. Two months later she started "dating" Chester A. Dowell and not long thereafter invited him to share her house trailer. Chester A. obtained a divorce from his then wife, Norine, on September 15, 1975,[1] and, according to Orpha, agreed to enter into a marriage relationship with her (Orpha) on October 14, 1975—an agreement commemorated mainly by Chester A.'s purchase of a couple of rings—though the would-be bride "knew there was a six-month waiting period in Oklahoma" before a divorcee could remarry. No evidence is there of a honeymoon nor of any celebration. Nonetheless, thought Orpha, life with Chester A. was blissful, and she enjoyed her wifely role until the night of April 7, 1976 when he became ill, and, after being transported to the Veterans Administration Hospital in Muskogee, succumbed within less than 24 hours. During these six months the deceased did not place any property in Orpha's name, nor did he add her name as a drawer on any checking or savings account. Whether this was normal or not did not matter to Orpha. "I didn't care," she said, "we were happy and he was sick and we took one day at a time because I feel like he knew his time was limited because he said that many times. . . . He spoke of his health being bad many times."

Appellant, Chester Ralph, on the other hand adduced evidence of facts and circum-

---

1. Norine evidently was not Chester A.'s first wife because his son, Chester Ralph, a chief petty officer in the U. S. Navy stationed in Hawaii, asked in his petition that his mother, Mary Barrick, be named administratrix.

stances which tended to be inconsistent with such a marriage. The evidentiary conflict, as we mentioned earlier, was resolved in Orpha's favor precipitating this appeal.

## II

Appellant's sole argument is that the nuptial finding of the trial court is "against the weight of the evidence" because (1) the impromptu marriage allegedly took place at a time when Chester A. had no capacity to enter into one, and (2) the testimony of Orpha and her witnesses not only contains inconsistencies but is completely neutralized by evidence of things Chester A. did during the last six months of his life which are incompatible with matrimony.

While there are certain facts and circumstances which raise in our minds doubts about the correctness of the trial court's finding—doubts which often cloud the legal sky when the lips of one party to such an informal union are sealed by death—we cannot say it is clearly against the weight of the evidence. Appellee presented evidence to support a finding that these essential elements of a common-law marriage existed: (1) an agreement between the parties to marry, and (2) consummation of that agreement by cohabitation as husband and wife. *Bothwell v. Way*, 44 Okl. 555, 145 P. 350 (1914). Appellee testified that such an agreement was entered into between her and Chester A. on October 14, 1975, and that they then began cohabiting as if they were a lawfully wedded couple. She adduced evidence corroborating these facts to the effect that she and Chester A. publicly held themselves out as husband and wife and that most of the people in Orpha's hometown, where they lived, thought they were married.

## III

The remaining question concerns the effect of Chester A.'s impaired right to remarry on October 14, 1975. Notwithstanding the fact that, for the purpose of remarriage, statutory law deems a divorced couple married for six months following the granting of a divorce—it characterizes a remarriage during such period as "bigamous" and any connubial "cohabitation" as "adultery," (1969 statutory amendment)[2] —the high court considers performance of the forbidden act to be valid rather than void. *Greenwood v. Greenwood*, Okl., 387 P.2d 615 (1963); *Plummer v. Davis*, 169 Okl. 374, 36 P.2d 938 (1934). Moreover even if one were to say the 1969 amendment with regard to adultery altered the *Plummer* concept to the extent that the legitimacy of the relationship is perishable during the prohibitory period, the ultimate result is not altered in this case because of a kindred holding to the effect that where the parties continue living together after the nuptial inhibition is removed, the adulterous concubinage ripens into a valid common-law marriage. *Burdine v. Burdine*, 206 Okl. 170, 242 P.2d 148 (1952). Here, insisted Orpha, the parties did continue to cohabit as husband and wife after March 15, 1976 thus vivifying the stillborn pact.

Affirmed.

BACON and NEPTUNE, JJ., concur.