580 F.2d 1011
 UNITED STATES of America, Plaintiff-Appellee,
v.
James Vernon HEATH, Donald Ralph Babb, Sharon Rose Babb,
Deborha Gayle Hyams, Ray Richmond, Alice Jean
Powell, Ted Richardson, and Tony
Richardson, Defendants-Appellants.
 Nos. 76-2158 to 76-2165.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 16, 1978.
Decided June 30, 1978.
Rehearing Denied Aug. 31, 1978.
 
 John E. Green, Acting U. S. Atty., Oklahoma City, Okl., for plaintiff-appellee.
 Rick Chew, Oklahoma City, Okl. (J. Andrew Williams, Legal Intern, on the brief), for appellants James Vernon Heath and Donald Ralph Babb.
 Michael C. Salem of Rawdon, Salem & McCoy, Norman, Okl., for appellants Sharon Rose Babb, Deborha Gayle Hyams, Ray Richmond, Ted Richardson and Tony Richardson.
 Jack S. Dawson, Oklahoma City, Okl., for appellant Powell.
 Before SETH, Chief Judge, and DOYLE and McKAY, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The defendants-appellants James Vernon Heath, Donald Ralph Babb, Sharon Rose Babb, Deborha Gayle Hyams, Ray Richmond, Ted Richardson, Tony Richardson and Alice Powell have here appealed convictions on heroin charges from the judgments entered by the United States District Court for the Western District of Oklahoma.
 
 
 2
 Count I is the conspiracy charge in which 20 people are alleged to have conspired to distribute heroin, contrary to 21 U.S.C. § 108. Named in this count are six unindicted co-conspirators.
 
 
 3
 Count II charges that on or about the 29th day of September 1975, James Vernon Heath, Roger Sanders and Earl Jones knowingly and intentionally imported approximately five ounces of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 952.
 
 
 4
 Count III charges that on or about the 29th day of September 1975, James Vernon Heath knowingly and willfully distributed to Barry Bruce Bolding approximately three ounces of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1).
 
 
 5
 The remaining counts of the indictment charged substantive offenses against Roger Sanders and Jackie Hoffman in Count IV, Donald Ralph Babb and Sharon Rose Babb in Count V, Alice Powell in Count VI, Ted Richardson in Count VII, Tony Richardson in Count VIII, John Cahill in Count IX, Ray Richmond in Count X, Laura Talkington in Count XI, Robert Leroy Quirk in Count XII and Emit Powell in Count XIII. The substantive offenses described particular sales.
 
 
 6
 Two defendants, Laura Talkington and Robert Leroy Quirk, were acquitted. Mistrials were granted as to Earl Jones, Tammy and Deborah Ramsey, and Connie and Conrad Janko. In those instances the jury was unable to agree as to the guilt of these persons of conspiracy.
 
 
 7
 Appellant Heath was convicted on three counts, namely, the general conspiracy count, the importation count and the distribution count described above. The Babbs, Donald and Sharon, were convicted of conspiracy and of distribution. Ted and Tony Richardson were convicted of conspiracy and of distribution, as was Alice Powell. Appellants Ray Richmond and Deborha Hyams were convicted of conspiracy.
 
 
 8
 The theory of the prosecution's case was that Vernon Heath was the leader of the conspiracy, which involved continuous heroin importation from Mexico and organized distribution. The other persons named in the conspiracy, according to the further theory of the government, were engaged in selling heroin at wholesale and retail levels.
 
 
 9
 Much of the testimony was given by Mary Jo Hulsey, who was given immunity and who, although named in the indictment, was not charged, and Barry Bolding, who was also given immunity in exchange for his testimony.
 
 
 10
 In her testimony, Mary Jo Hulsey described a number of trips to Mexico and back, in fact, 50 such trips. She started making these trips in the summer of 1975 for Earl Jones because she owed him money. On the first trip Roger Sanders, one of the absent indicted persons, gave her a package of heroin and told her to place it inside her body and carry it across the border. She followed this routine over a considerable period of time. In each instance, she would carry about $6,000 to Mexico and would there obtain four ounces of raw heroin. Throughout 1975, she worked for Roger Sanders, getting the money from Roger, who told her that it was Heath's money. On two occasions she said that Heath gave the money to her himself. She also said that Roger Sanders and Heath were partners, but that Heath controlled the financial aspects of the partnership.
 
 
 11
 When she returned from Mexico, she brought the heroin to Roger, who cut it, after which she would sometimes deliver some to both Heath and Jones. She said that Roger had told her not to tell Jones that Heath was getting some of the heroin. On one occasion, according to Ms. Hulsey, Donald Babb and Eddie Lawson came to a motel and received some of the heroin from Roger. She said that she knew nothing about the Powells, the Hyamses, the Ramseys, Richmond or the Jankos.
 
 
 12
 She told the court and jury about her arrest in June 1976, by an Oklahoma policeman, Jack Hill, who was in charge of the investigation. The arrest was for possession of heroin with intent to distribute, but, according to her, Hill did not file any charges against her. She also testified that she had a long acquaintanceship with Earl Jones and also that she transported the heroin across the border at the behest of and under the direction of Roger Sanders; that Heath did not direct her in any dealings.
 
 
 13
 A controversial part of her testimony was a statement which she gave more or less spontaneously to the lawyer for Earl Jones, who was then cross-examining her, that she had delivered some cocaine to his law office.
 
 
 14
 Defendant Heath urges that her cross-examination revealed a certain amount of inconsistency with respect to the extent of her knowledge of dealings with Vernon Heath.
 
 
 15
 Another witness who was given immunity was Barry Bolding. He testified that he was a heroin user starting in 1974, and said also that he obtained his heroin from one Billy Baker, who was now dead, who got it from Vernon Heath. Later, Baker introduced him to Heath in order for him (Bolding) to be able to pick up the heroin from Heath. Bolding said that he frequently visited Heath's apartment and bought heroin from him, and on some of these occasions Heath would have Ray Richmond, who resided with him, go get the heroin. Finally, Bolding became a "wholesaler" for Heath, and he said that the Babbs, the Powells and the Hyamses were similarly engaged. Bolding further testified that when Heath went out of town he would tell him that he could get his heroin from Donald Babb, who was Heath's nephew. He told about an occasion when he had gone to the Babbs' apartment and bought heroin from them. Bolding testified about setting up an agreement to buy with Bobby Hyams. This involved three ounces of heroin and it also involved calling Deborha Hyams and asking her to bring the heroin to his apartment. This transaction was corroborated by narcotics officers who were with Bolding at the time. Deborha Hyams was arrested on that occasion and the three ounces of heroin were revealed in connection with the search of her car. Bolding also testified that he had purchased one-fourth ounce of heroin from Alice Powell, having arranged the purchase with her husband. Bolding said that he was not acquainted with Earl Jones, the Richardsons or the Jankos.
 
 
 16
 Melody Bolding, wife of Barry, testified to Ray Richmond having hidden heroin for the benefit of Heath and to receiving heroin from Richmond and paying Heath for it.
 
 
 17
 Jerry Gray testified to having sold heroin for Billy Baker and to accompanying Baker when he went to Heath's apartment for the purpose of paying for the drugs or to pick up heroin. Gray said that he had never actually observed these transactions because Baker and Heath would go upstairs. Gray further testified that Baker worked for Heath and lived in McCloud at this time. He also said that he had heard rumors that Billy's death had been murder.
 
 
 18
 Johnny Hopcus testified that he was a purchaser of heroin from Barry Bolding and from Donald and Sharon Babb when the latter lived in McCloud. He testified to the fact that the Babbs' source of heroin was Heath. He also said that Billy Baker, the Boldings, Emit Powell and Bobby Hyams also sold for Heath. (He suspected that Heath was responsible for Billy Baker's death.)
 
 
 19
 Eddie Lawson was another one of the group who was granted immunity in order to testify. He said that he had been an addict and also a heroin dealer. During the year 1974, he commenced buying from Ted and Tony Richardson. He said that they got their heroin from Babb and Emit Powell. Later, Lawson bought heroin from Donald Babb every day for several months. Lawson said that he also bought heroin from Laura Talkington two or three times and that she introduced him to "Boston Bob," a "connection" who lived with Donald Babb and got heroin from him. Later, Babb's relationship with "Boston Bob" broke down and he offered Lawson money to kill Bob. The two of them beat up "Boston Bob" and threatened to kill him if he did not leave town.
 
 
 20
 Lawson also said that Emit Powell, Bolding and Donald Babb sold for Heath; that Tom Ramsey was a heroin dealer; that Babb was his "connection"; and that he had gone with Ramsey to get heroin from Emit Powell. He also testified to Babb's telling him that May Jo Hulsey was one of the people engaged in bringing the heroin across the border. Lawson corroborated Mary Jo Hulsey's story regarding the meeting between Babb, Roger Sanders and Lawson at the motel. He said that Babb had sent Quirk to deliver heroin once.
 
 A.
 
 21
 The points which are relied on by Heath and Babb for reversal include the following:
 
 
 22
 First, that there was prosecutorial misconduct throughout the trial which included the Assistant United States Attorney's coaching a witness to give an answer to a question in cross-examination which constituted an attack on the morality of the attorney for Earl Jones.
 
 
 23
 Second, that it was error for the prosecution to misrepresent the existence of Jencks Act materials.
 
 
 24
 Third, that the prosecution misrepresented the facts concerning inducements which had been given to government witnesses.
 
 
 25
 Fourth, it was error for the prosecution to use an oral confession of another defendant to cross-examine one of the defendants.
 
 
 26
 Fifth, that the district attorney so conducted himself as to deprive the defendant of a fair trial.
 
 B.
 
 27
 The court erred in refusing to give defendant's requested instructions relative to his theory of defense.
 
 C.
 
 28
 The court erred in its instruction defining specific intent and the proof necessary to establish intent.
 
 D.
 
 29
 That the trial court abused its discretion by recalling three court witnesses in an effort to cure the Jencks Act violations.
 
 E.
 
 30
 That the trial court erred in conducting the trial on the basis that it was a single conspiracy, whereas at least two separate conspiracies existed.F.
 
 
 31
 That it was error for the court to submit to the jury for its determination the issue of guilt or innocence on Count II of the indictment charging that Heath, Roger Sanders and Earl Jones knowingly and intentionally imported heroin into the United States from Nogales, Mexico.
 
 
 32
 In their joint brief, appellants Sharon Babb, Deborha Hyams, Ray Richmond, Ted Richardson and Tony Richardson state that they adopt the statement of facts and argument presented by appellants Heath, Donald Babb and Alice Powell in their briefs. They also raise several new issues, most notably that the heroin found in Deborha Hyams' car was the fruit of an illegal arrest and coerced consent to search and that they were all prejudiced by the issuance of a bench warrant for her arrest in the presence of the jury when she was late for trial. They also argue that their ability to cross-examine witnesses was unreasonably restricted on a number of occasions. They also argue that it was error not to strike or to give a limiting instruction with regard to testimony about inquiries from other states about heroin trafficking by Heath, about Alice Powell's post- indictment arrest on an unrelated charge and about Ted Richardson's use of heroin since the trial. These arguments are not significant here.
 
 
 33
 Alice Powell, in her separate brief, adopts the Heath-Babb arguments about prosecutorial misconduct, elaborating on it to some extent, and, like the others, argues that she was subjected to prejudicial joinder. She is the one who argues that the prosecution obstructed defense efforts to interview witnesses, but we see no proof to support such a conclusion. She also argues that the evidence was insufficient to connect her with the conspiracy and that the government's cross-examination of her about a post-indictment arrest was inflammatory. She cannot complain about this in view of the fact that her counsel opened the door to this in his questions to her on direct.
 
 I.
 
 34
 WHETHER PROSECUTOR MILLER WAS GUILTY OF MISCONDUCT WHICH
 
 CALLS FOR REVERSAL
 
 35
 The central issue presented has to do with the alleged effort of Assistant U. S. Attorney Mr. Miller coaching the witness Mary Jo Hulsey. It is claimed that Mr. Miller, who was at counsel table while the attorney for defendant Earl Jones was cross-examining Ms. Hulsey, nodded his head to the witness and in that way gave a signal to her that she should make an unsolicited statement to the lawyer to the effect that she had been given a package of cocaine by Roger Sanders to deliver to the lawyer at his office.
 
 
 36
 Another defense attorney claimed to have seen Mr. Miller nod his head to the witness Hulsey just prior to her giving a reply to the questions of the cross-examiner. The examining lawyer was cross-examining Mary Jo Hulsey in an effort to question her credibility about her experiences with drugs besides heroin and her response was the statement in question. Obviously, the lawyer was not questioning her about this subject. He was questioning her about her personal experiences with drugs. There was no immediate motion to strike or admonish the jury or for mistrial, but some time later in chambers a motion for mistrial was made. Also, a motion for severance was made and both were denied.
 
 
 37
 In conference in chambers Miller said that Ms. Hulsey had told him of the cocaine matter and that he had told her not to mention it unless it was necessary in order for her to tell the truth, and that if he had nodded his head it was because he knew what she was about to say. The trial court's response to defense counsel's motion for mistrial was that they were overestimating the importance of such a remark.
 
 
 38
 In view of the fact that the trial court did not see the incident and did not regard it as important, we are at a disadvantage in reviewing it. In essence, the trial court said that there was no prosecutorial misconduct. While it raises a suspicion in our minds, still we do not feel justified in granting relief based on a record that, to say the least, is incomplete. The fact that we, as judges, might have handled the matter differently is not the test. It certainly would have been best to strike the remark made as fully irrelevant and to admonish the jury to ignore it. No such motion was made, and a belated motion for a mistrial is not the accepted procedure in this Circuit following such an incident. United States v. Eaton,485 F.2d 102 (10th Cir. 1973).
 
 
 39
 The remaining question is whether it was plain error for the court not to strike it on its own motion. We conclude that it was not, particularly in light of the fact that the defendant Jones, the client of the lawyer who was questioning Ms. Hulsey at the time of the gratuitous statement, was not even convicted at this trial. Thus the jury was apparently not impressed with the statement of the witness Hulsey. The prejudice, if any, to the other defendants would be indirect and the manner in which the jury selected and discriminated in reaching its verdicts, acquitting some and disagreeing as to others, does not tend to persuade that they were acting on passion or prejudice.
 
 
 40
 The other acts of prosecutorial misconduct involve failure of the district attorney to satisfy not only the letter but the spirit of the Jencks Act. The claim is that the prosecutor acted in bad faith when he failed to provide certain witness statements producible under the Jencks Act until their existence had been shown through the testimony of the witness.
 
 
 41
 The facts are these. The statement of Barry Bolding was produced. However, during cross-examination it was discovered that the government had another Bolding statement which the district attorney had neglected to produce on the basis that it was merely repetitious of the first. However, the court determined that it was not merely repetitive; that there were substantial differences between the statements; and that the defense was also entitled to be given the second statement. The court called a recess in order to give defense counsel an opportunity to see the withheld statement, and it also gave the two attorneys who had already questioned Bolding another chance to examine him in the light of the second statement. The court explained the situation to the jury and reasoned that there had been no prejudice. The court also said that it believed that Miller had acted in good faith. At the same time, he admonished him not to do such a thing again.
 
 
 42
 Following the Bolding incident, the defense attorneys inquired as to whether there was an additional statement made by the witness Hulsey, who had already testified. The court directed Miller to inquire so as to make sure that no one on the prosecution's side, including state officers, had such an additional statement. He also warned Mr. Miller that it would be a bad breach if such a statement existed and had not been produced. Miller assured the court that he had inquired and that all statements had been disclosed, but some days later during cross-examination of a state officer, it came out that an additional sworn statement had been taken from Hulsey by the state. Miller denied knowledge of this. The court ordered that the statement be given to the defense and ordered also that Hulsey be recalled for additional cross-examination. Again, the court determined that Miller had acted in good faith and that the problem was the lack of familiarity of the state officers with federal court practice. The statements of two other witnesses were also discovered at this time and they were recalled for further cross-examination.
 
 
 43
 There is some confusion also because of the terms of 18 U.S.C. § 3500, which states in substance that in any United States criminal prosecution the United States is obligated to produce "any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." It seems obvious to us that a witness who is to testify for the government, who has made a statement to state officers, is subject to the Act. It will not do for the district attorney to stand on technicality and say that he does not have actual possession of it.[1]
 
 
 44
 It is difficult to believe that the district attorney who is preparing his case does not inquire of state officers as to whether they hold any written statements of the witness where the state officers have participated in the investigation. The reason that we do not reverse the case on this point is that possible sanctions against the district attorney should not necessarily include reversal of convictions where the appellants are not able to demonstrate prejudice and are not shown to have made motions to strike the testimony of the witness. We are not justified in giving effect to the attorney's preference that the cause be reversed on this account.
 
 
 45
 The Jencks Act does not require a striking of testimony or the declaring of a mistrial for every failure to comply. The remedy or sanction in each instance is for the trial court to impose. See United States v. Perry,153 U.S.App.D.C. 89, 471 F.2d 1057 (1972). Courts have found that late disclosure caused no prejudice in instances where an opportunity for full cross-examination had been provided and where the trial court found no bad faith on the prosecutor's part. See, for example, United States v. Polizzi,500 F.2d 856 (9th Cir. 1974), Cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); United States v. Principe, 499 F.2d 1135 (1st Cir. 1974); United States v. Gottlieb, 493 F.2d 987 (2d Cir. 1974).
 
 
 46
 The next item about which there is contention is the so-called conspiracy report prepared by a state narcotics agent, one Troy Leathers. Copies of four reports were provided to the defense lawyers. A fifth was not. Examination of this report by the court resulted in a determination that there was nothing in it which would be of any help to the defendants in their defense. The defendant has the burden of showing that a statement is indeed a Jencks Act statement. See United States v. Dingle, 546 F.2d 1378 (10th Cir. 1976); United States v. Smaldone, 484 F.2d 311 (10th Cir. 1973), Cert. denied, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974), and since there was no such showing, the trial court's finding that the report was not one which had to be produced will not be disturbed in the absence of a showing of clear error. See United States v. Pennett, 496 F.2d 293 (10th Cir. 1974).
 
 
 47
 The closest that this report came to containing statements of the witness was in two paragraphs which related the substance of the testimony. The report also summarized the statements of some other witnesses, but it was not necessarily an account which could constitute statements. See Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).
 
 
 48
 A similar problem which exists with respect to unsigned statements was the statement of Officer Gillum, a state agent, who said that the only statements that he had put in writing had been unsigned communications for the prosecution's use only. The court refused to require disclosure of these. The paper in question is not before us, and so we have no way to evaluate it.
 
 
 49
 A further prosecutorial problem has to do with defense motions for information concerning unindicted co-conspirators and the benefits that they had been given or promised. The district attorney said that there had been no plea bargaining and no promises or inducements, but cross-examination of some of the prosecution witnesses at least created some doubt on this. Some of the prosecution witnesses were granted immunity from prosecution on the stand in front of the jury, and in any event the defense attorneys were given full latitude to cross-examine and bring out the facts. We are unable to see that any prejudice was suffered.
 
 
 50
 The next problem revolves around a question propounded by prosecutor Miller to the defendant Heath on cross-examination. The exact question was as follows:
 
 
 51
 Are you aware that Donald Babb has given a statement to Officer Gillum and Jack Hill here since he has been in jail, and in that statement he has said that everything that you have testified to here about your involvement in the heroin business is an absolute total lie?
 
 
 52
 The answer of Heath was "I believe he is lying if he give one." The next question was "O.K., can you tell me why he would give a statement about you and lie?" It was then that the attorney for Heath objected. The basis for the objection was that a request had been made on numerous occasions for any statements by any defendant in the case. He further said that Mr. Hill, the state court investigator, had said that there was no statement. Thereupon, Miller said that they were talking about written statements and that this was an oral statement.
 
 
 53
 Following the testimony of Babb, Officer Gillum was called as a rebuttal witness and testified as to a statement that Babb had made to him. The objection that we have to the question propounded to Heath by Miller is that it was improper in form and impossible for the witness to answer. First of all, how could Donald Babb have given a statement saying that everything that the witness had testified to at the present time was an absolute and total lie? This purported to be a statement that was given while Babb was in jail at some previous time. On the other hand, in cross-examining a witness it is permissible to call his attention to most anything for the purpose of refreshing his recollection. This includes even hearsay. The purpose of this broad rule is to give the examiner a full opportunity to induce the witness to correct his testimony. Since, however, the objection is not based upon the competency or relevancy of the statement, but, rather, is based upon failure of disclosure, and since the trial court did not regard it as a statement that was required to be produced under § 3500, we do not see this as a substantial error or as being prejudicial.
 
 
 54
 When Babb took the witness stand he denied that he had made a statement recognizing that Heath was running a heroin organization. Officer Gillum was called in rebuttal or impeachment, and he testified to Babb's statement, which recognized the fact that Heath was engaged in operating a heroin organization. Although the other defendants objected to this on the basis that it was hearsay, this objection was not good either, because it does not make any difference if it was hearsay or not if it was offered only to discredit Heath's testimony.
 
 
 55
 In United States v. Lemon, 497 F.2d 854 (10th Cir. 1974), government witnesses had made prior statements implicating the defendant, but denied this on the stand. The government was permitted to impeach them with the prior statements. It was noted that the statements were inadmissible as substantive proof because not made during the conspiracy, but the court upheld their use for impeachment purposes, with instructions to consider them only with regard to credibility. The court noted that the witnesses had been available for cross-examination and stated, moreover, that even if admission of the hearsay statements was error, it would not be reversed where it was clearly harmless in the light of the other evidence and the content of the statements.
 
 
 56
 Babb contends that he was prejudiced by the failure to disclose the statement made to Officers Gillum and Hill. It is true that Babb had moved for discovery of any statements made by him including the substance of oral statements, confessions or admissions. This request was in accordance with the amendments to Rule 16(a)(1)(A), which provides for discovery of the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant.
 
 
 57
 Miller contended that he was excused from furnishing the statement because he had not intended to offer it in the case in chief against Babb. The words of the Rule appear to support Miller's position. United States v. Taylor, 536 F.2d 1343 (10th Cir.), Cert. denied, 426 U.S. 962, 97 S.Ct. 388, 50 L.Ed.2d 330 (1976), suggests a different result. In that case a prosecution rebuttal witness testified concerning an oral statement which had not been disclosed. The court said that the disclosure would not have been required under the old Rule 16, but gave a dictum that it would have been required under the amended version.
 
 
 58
 The question remains whether this statement was prejudicial to Babb. We hold that it was not and this is the test which the courts apply in determining whether it is a basis for reversal. United States v. Arcentales,532 F.2d 1046 (5th Cir. 1976); United States v. Johnson, 525 F.2d 999 (2d Cir. 1975), Cert. denied, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976); United States v. Lewis, 167 U.S.App.D.C. 232, 511 F.2d 798 (1975). Before Babb took the stand he knew about this alleged statement. Furthermore, it cannot be said that the reference of Babb to Heath's conducting a heroin business constituted either direct or substantial prejudice as far as Babb was concerned. Furthermore, this particular statement was used on rebuttal solely for the purpose of testing credibility or for impeachment. Thus it was not offered testimonially.
 
 
 59
 In summary, we are of the opinion that while the incidents which we have discussed are not to be condoned, nevertheless the fact of the statements not having been disclosed did not prejudice the defendants. Also, the trial court believed that many of the problems resulted from communication difficulties between the state officers and the federal prosecutors. His conclusion that there was no bad faith involved may well be correct, and even though we might well have been more vigorous in our censure of Mr. Miller, we do not consider his excesses to be a basis for reversing this case.
 
 II.
 WAS IT ERROR FOR THE TRIAL COURT TO DENY THE
 
 60
 DEFENDANTS-APPELLANTS' REQUESTS FOR RELIEF BASED
 
 UPON THE ALLEGED VARIANCE GROWING OUT OF
 
 61
 THE ALLEGED SEVERAL CONSPIRACIES?
 
 
 62
 Defendants argue that it was error to allow this case to go to trial in view of the theory of a single large conspiracy. They contend that the links tying the defendants in are questionable. For example, they say that there is no connection between Earl Jones and the Heath organization. (It is to be remembered that the jury failed to agree as to Earl Jones.) The source of heroin for both of them was Roger Sanders and Mary Jo Hulsey. Similarly, with the Jankos and Ramseys, the only testimony was a report that Connie Janko had said that the Ramseys' heroin came from McCloud and Lawson's statement that Donald Babb was Ramsey's "connection." It can be argued that the hung jury indicates that the jury had some question as to whether or not these people were part of the conspiracy.
 
 
 63
 In our view, there was sufficient evidence to justify treating this as a single conspiracy. In reaching this conclusion, we are mindful that the cause must be viewed in the light most favorable to the government. See United States v. Crocker, 510 F.2d 1129 (10th Cir. 1975). Our reasons follow:
 
 
 64
 All participants received heroin from a common source, that is, as a consequence of Heath or someone connected with him giving money to Mary Jo Hulsey. She, in turn, made the purchase in Mexico, returned and delivered it to Roger Sanders, who would cut it, and she then delivered it to Heath and to Earl Jones. The evidence showed that the wholesalers and sellers were in turn supplied with this same source.
 
 
 65
 The evidence is somewhat questionable in some few instances, which will be considered hereafter specially. Whether the evidence establishes a single conspiracy is a question for the jury to decide where, as here, there is evidence from which the jury can reach such a conclusion. United States v. Ricco, 549 F.2d 264 (2d Cir.), Cert. denied, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977).
 
 
 66
 In Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Supreme Court upheld convictions for conspiracy to sell liquor at prices above the ceilings established by law, notwithstanding that the salesmen were unaware of the participation of an unknown owner:
 
 
 67
 they knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all.
 
 
 68
 332 U.S. at 558, 68 S.Ct. at 257.
 
 
 69
 Also, in Ritter v. United States, 230 F.2d 324, 328 (10th Cir. 1956), we said:
 
 
 70
 Because the proof did not establish every overt act charged, or failed to connect up every alleged coconspirator with the basic conspiracy charged, does not necessarily mean that the alleged conspiracy was thereby broken up into independent fragments.
 
 
 71
 In United States v. Ortega-Alvarez, 506 F.2d 455 (2d Cir. 1974), Cert. denied, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975), the court said:
 
 
 72
 when large quantities of heroin are being distributed, each major buyer must be presumed to know that he is part of a wide-ranging venture, the success of which depends on the performance of the others whose identities he may not even know.
 
 
 73
 506 F.2d at 457.
 
 
 74
 Accord, United States v. Perry, 550 F.2d 524 (9th Cir.), Cert. denied, 434 U.S. 827, 98 S.Ct. 104, 51 L.Ed.2d 85 (1977); United States v. Sperling, 506 F.2d 1323 (2d Cir. 1974), Cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).
 
 
 75
 Our condition here is quite different than that which was shown in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where there were a number of parallel conspiracies with one common figure in all of them. No common purpose was shown; there was no interdependence among the participants. The lack of this common purpose was the important factor. See United States v. Butler, 494 F.2d 1246 (10th Cir. 1974), wherein three common conspiracies were shown and where there was no common purpose among the defendants.
 
 
 76
 Here, there was such a purpose, the acquisition, importation and distribution of heroin. The efforts of each participant affected the supplies and profits of the entire enterprise. Butler does not require that each participant know and directly interact with each of the other conspirators, even though it does emphasize the importance of existence of proof of individual guilt.
 
 
 77
 It does not help the defendants on appeal to point to Jones or Janko-Ramsey as being separate and apart in view of the fact that the evidence clearly establishes that the appellants before the court are part of a single conspiracy. We need not finally evaluate the Jones or Janko-Ramsey participation at this time. It is enough to consider, Heath, Babb and those related to them.
 
 III.
 
 78
 DID THE COURT ERR IN REFUSING TO GRANT THE MOTIONS FOR SEVERANCE?
 
 
 79
 The severance motions were made both before and after the government's case and at various other times as well. The decision whether to grant a severance is within the discretion of the trial court, and ordinarily the decision will not be reversed in the absence of a strong showing of prejudice. United States v. Walton, 552 F.2d 1354 (10th Cir.), Cert. denied, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); United States v. Gamble, 541 F.2d 873 (10th Cir. 1976). The fact that the severance would improve the chances for acquittal is not sufficient. United States v. Campanale, 518 F.2d 352 (9th Cir. 1975), Cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).
 
 
 80
 The Federal Rule of Criminal Procedure 8(b) allows joinder of defendants who are alleged to have participated in the same act or transactions or series of acts. Since each member of a conspiracy is responsible for the acts of his co-conspirators, which acts are in furtherance of the conspiracy, the evidence of the acts of the others would be admissible in a separate trial. So, if the conspiracy was proven, the evidence admissible against Heath, for example, would be binding on those who joined the conspiracy even after it had started or were in privy to particular acts and statements. It is important to bear in mind that the evidence shows this to be a conspiracy which is not only quite broad in scope but also has a vertical character which is of considerable depth. We have in mind the fact that great quantities of heroin were shown to have been imported by these defendants and sold systematically at both wholesale and retail levels. In order then for a particular defendant to agree to join the conspiracy, there ought to be substantial evidence connecting the person with the conspiracy.
 
 IV.
 
 81
 DID THE TRIAL COURT ERR IN ITS RULINGS THAT THE DEFENDANTS
 
 
 82
 ALICE POWELL, SHARON BABB, RAY RICHMOND, TED RICHARDSON,
 
 
 83
 TONY RICHARDSON AND DEBORHA HYAMS WERE NOT ENTITLED TO
 
 
 84
 ORDERS SEVERING THEIR TRIALS FROM HEATH AND DONALD BABB, AND
 
 
 85
 WAS THE EVIDENCE SUFFICIENT TO SHOW PARTICIPATION IN THE
 
 
 86
 HEATH-DONALD BABB CONSPIRACY WITH RESPECT TO ALICE POWELL?
 
 
 87
 Apart from Alice Powell, the defendants argued this in the context of their motions for severance. Alice Powell argued the insufficiency of the evidence independently.
 
 
 88
 1. Alice Powell seeks reversal on the ground that she had been convicted on evidence which identified her husband, Emit Powell, with the conspiracy. She is shown to have been involved in only one sale, that involving the Boldings. In this instance Emit had originally arranged the transaction. The Boldings came to the Powell home to obtain one-fourth ounce of heroin and it was Alice Powell who delivered this quantity of heroin to the Boldings. Unquestionably, this evidence was sufficient to establish her guilt of the substantive offense of distribution of heroin. Whether it is sufficient to tie her into the conspiracy is another matter. There is evidence from another witness, Melody Bolding, that she and her husband were working together. It is often said that once the existence of a conspiracy is established, only slight evidence is needed in order to connect a particular defendant with it. However, this does not eliminate the necessity for establishing defendant's guilt beyond a reasonable doubt on the conspiracy charge. United States v. Peterson, 549 F.2d 654 (9th Cir. 1977).
 
 
 89
 We have considered the decision of the Second Circuit in United States v. Sperling, 506 F.2d 1323 (2d Cir. 1974), wherein the court found evidence of a single delivery of Cocaine to be inadequate under the circumstances. In holding that it was insufficient, the court said that there must be independent evidence of the defendant's knowledge of the broader nature of the conspiracy, or else the act must be one from which such knowledge could be inferred.
 
 
 90
 We are not unsympathetic to the cause of the defendant Powell, but we cannot ignore the fact that she shared possession of heroin with her husband and made an actual sale. Heroin is, of course, such a diabolic drug in itself that trafficking in it raises many unfavorable inferences. The evidence to support the conviction in the instance of the substantive offense is, of course, more than adequate, and the evidence to make her a part of the conspiracy is also sufficient. We do consider the sentence to be grossly excessive. Fifteen years for this limited participation strikes us as being disproportionate. Her husband, the real culprit, meanwhile unconscionably remains at large. The trial court should reconsider the sentence.
 
 
 91
 2. As to the defendant Sharon Babb: She was shown to have made a sale to Hopcus. Also, there was evidence given by Bolding to the effect that when he went to the Babb's apartment it was impossible for the sale to be completed until Sharon returned home and found where the heroin was hidden. Lawson confirmed the fact that Sharon was present several times when Donald Babb weighed out heroin to sell to him. The evidence against Sharon Babb was legally sufficient.
 
 
 92
 3. The sufficiency of the evidence against Ray Richmond. The Boldings testified that Richmond lived with Heath, that he hid heroin for him and was on occasion seen to obtain heroin for sale and delivery on behalf of Heath. In our judgment this evidence is sufficient in law to uphold the jury verdict as to this defendant.
 
 
 93
 4. We have the same conclusion as to Ted Richardson. Lawson testified that he had purchased heroin from Ted on several occasions and that he had accompanied Ted to Babb's house in order to pick up heroin on several occasions. Darnell testified that he saw Ted bring heroin to Lawson's house. These various acts are sufficient in law to support the judgment against Richardson.
 
 
 94
 5. Similarly, Tony Richardson is adequately involved. Darnell testified that he had purchased heroin from Tony on 15 occasions. Lawson said that he had purchased heroin from Tony frequently; that Tony got it first from Ted, then from Babb and Emit Powell.
 
 
 95
 6. The adequacy of the evidence with respect to Deborha Hyams: Bolding testified that Bobby and Deborha Hyams were wholesalers for Heath. However, the only direct evidence against her was that she responded to a call from Bolding to deliver three ounces of heroin. She brought it to Bolding's house on January 29, 1976, where she was arrested by the officers who were waiting there with Bolding. Her argument is that the heroin which was discovered in her car should have been suppressed based on the fact that she consented under duress.
 
 
 96
 The officers and Bolding all testified that the officers had arranged for the purchase of three ounces of heroin from Bobby Hyams and Bolding had called up that morning and had asked Deborha to bring the heroin over. The Hyamses lived about a mile away and she arrived about fifteen minutes later. The officers asked to search her purse and they found nothing. They then called a matron to do a body search and again found nothing. She was advised of her rights, but the officers' testimony was unclear as to whether she was free to go at this time. She was asked where her car was and she responded that she had not driven it over. Later, however, when she was reminded that she was in her stocking feet and that her stockings were clean, she said that she had the car and had dropped the keys inside the couch. The keys were removed and she signed the consent allowing the search of the car which was located in a parking lot. She claims that she was told that she had no choice; that they could get a warrant. The officers deny that there was any coercion and said that she told them where the heroin was in the car before they opened it.
 
 
 97
 From an evaluation of the total surrounding facts, we are of the opinion that there was probable cause for the arrest and for the search incident to the arrest. The trial court found that there was consent and there was ample evidence to support this finding. See Schneckloth v. Bustamonte,412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). See also United States v. Watson, 423 U.S. 411, 424-25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).
 
 
 98
 Our decision in United States v. McDevitt, 508 F.2d 8 (10th Cir. 1974), does not apply. It is substantially different.
 
 
 99
 The final question is whether the evidence of this single transaction sufficiently ties Mrs. Hyams to the conspiracy. We answer yes. The delivery of three ounces of heroin worth $3,000 speaks strongly that she was a part of it.
 
 
 100
 We have also considered her complaint about the issuance of a bench warrant for her arrest when she was late for trial one morning. She moved for a mistrial on this account. The denial of this motion was not in our judgment error.
 
 V.
 
 101
 DID THE COURT ERR IN THE INSTRUCTIONS WHICH IT GAVE TO THE JURY?
 
 
 102
 Appellants Babb and Heath in their brief challenge the trial court's failure to give what they call their theory of the case which, in essence, suggested to the jury that the case against Heath was explainable in terms of animosity on the part of Officer Hill toward Heath. The claim in the tendered instruction was that Hill had framed Heath and had pressured the witnesses into testifying against him. The form of this instruction was more of a jury speech than an instruction and we are of the opinion that the court acted properly in not sponsoring such a statement. See United States v. Nolan, 551 F.2d 266 (10th Cir. 1977).
 
 
 103
 There is also objection to the instruction on intent, which was given by the court and, especially, specific intent. The first part of the court's instruction is not unlike that which is found in § 13.03 of Devitt and Blackmar, Federal Jury Practice and Instructions. The language which is contained in the instruction is:
 
 
 104
 As a general rule, it is reasonable to infer that a person ordinarily intends all of the natural and probable consequences of acts knowingly done and knowingly omitted.
 
 
 105
 We were unenthusiastic about this language in United States v. Mackay, 491 F.2d 616 (10th Cir. 1973), Cert. denied, 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974). However, in that case we said that if the court made clear to the jury that the burden was on the government to prove specific intent beyond a reasonable doubt, the jury could return a verdict of guilty; that it was not prejudicial. See McCarty v. United States, 409 F.2d 793 (10th Cir.), Cert. denied, 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969), and Beck v. United States, 305 F.2d 595 (10th Cir.), Cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962), which hold similarly in regard to the specific "natural and probable consequences" language. In Accord are United States v. Netterville, 553 F.2d 903 (5th Cir. 1977), Cert. denied, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). But see, United States v. Bertolotti, 529 F.2d 149 (2d Cir. 1975). This latter case is very critical of the language.
 
 
 106
 The saving grace here is that the charge as a whole is satisfactory in terms of requiring that the jury be convinced beyond a reasonable doubt as to each element, including that of intent. So even though we consider it hazardous for a trial court to insert this language, and although we wish to make it clear that we do not approve it, we are not going to reverse the case on account of its presence since, in the context of the charge as a whole, there is no reversible error.
 
 VI.
 
 107
 DID THE COURT ERR IN PERMITTING THE RECALL OF THE WITNESSES
 
 
 108
 AND IN NOT PERMITTING THE DEFENDANTS TO OFFER THE
 
 STATEMENTS IN EVIDENCE AND LET THE JURY
 
 109
 DRAW THEIR OWN CONCLUSIONS?
 
 
 110
 In our judgment the procedure followed by the court was proper and was not an abuse of discretion.VII.
 
 
 111
 WHETHER THE TRIAL COURT ERRED IN RULING, FIRST, THAT THERE
 
 
 112
 WAS SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION OF HEATH
 
 
 113
 ON A CHARGE OF UNLAWFUL IMPORTATION OF HEROIN, AND WHETHER
 
 
 114
 THE COURT ERRED IN RESTRICTING CROSS-EXAMINATION.
 
 
 115
 As to the Heath claim, evidence showed that on the September 29, 1975 importation, Mary Jo Hulsey testified that Heath gave her money on that day with which she bought heroin in Mexico, and that after she had brought it back and Roger Sanders had cut it, she delivered several ounces to Heath. This evidence is an adequate answer to Heath's contention. We are not disposed to reverse on the ground that the trial court abused its discretion in restricting cross-examination. In many of these instances cross-examination involved defendants who are not appellants here. It is sufficient to say that the extent of cross-examination was a matter of trial court discretion which will not be reversed in the absence of abuse of discretion. United States v. Speir, 564 F.2d 934 (10th Cir. 1977); United States v. Walton, 552 F.2d 1354 (10th Cir. 1977).
 
 
 116
 There were 14 defense lawyers and all of the major witnesses were cross-examined extensively. It was an unwieldy trial to manage, and considering the length of the testimony and the complexity of it, the court conducted it very well. We do not perceive prejudice arising from limitations on cross-examination.
 
 
 117
 The case was a difficult one for trial under one roof. There are too many charges, too many defendants and too many lawyers.
 
 
 118
 The judgments are affirmed as to all appellants.
 
 
 119
 McKAY, Circuit Judge, dissenting as follows:
 
 
 120
 This case began as a 14 count indictment against 20 individuals. They were all brought under one roof by the inclusion of one count of a grand conspiracy including all the accused. By the time the trial began the stage for disaster was set. There were in the courtroom 15 remaining defendants,[1] 14 defense lawyers, two prosecutors and 14 separate counts running to various defendants for one judge to try to control and for one jury to try to comprehend. I agree with the majority's observation that "(t)here are too many charges, too many defendants and too many lawyers." I disagree with the majority's conclusion that the end product is one which we can sustain. There were too many objectionable rulings on evidence, too much confusion, too little evidence of the one grand conspiracy which the government used as its sweeping net to bring this morass "under one roof," and possibly too much misconduct by the prosecution.
 
 
 121
 When the government elects to bring these grand conspiracy cases, especially where the evidence, as I see it, wholly lacks linking proof that would meet the standards we laid down in United States v. Butler, 494 F.2d 1246, 1251-52 (10th Cir. 1974), it is not our responsibility to minimize the problems thereby created but rather to be "particularly vigilant . . . to see that such a relaxation (in evidentiary standards) does not occur and that conviction is not predicated upon suspicion." Id. at 1254. It seems to me that the majority has not viewed the conspiracy quagmire in this case with the vigilant caution mandated by the Supreme Court and our own opinions. Although the theory of conspiracy, especially in drug cases, is one of the government's favorite weapons, we cannot forget that "(g)uilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application." Kotteakos v. United States, 328 U.S. 750, 772, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). There the Court also instructed:
 
 
 122
 When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.
 
 
 123
 Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.
 
 
 124
 Id. at 773, 66 S.Ct. at 1252. Similarly, this court noted in United States v. Butler, 494 F.2d at 1254, that:
 
 
 125
 The standard of proof required in criminal cases is a cornerstone of constitutional due process. In a case such as this one, involving numerous defendants, multiple transactions, and varying degrees of participation, the task of sifting the evidence relating to each defendant becomes particularly difficult, and a special danger exists that the degree of proof required for conviction might be relaxed. We shall be particularly vigilant in such cases to see that such a relaxation does not occur and that conviction is not predicated upon suspicion.
 
 
 126
 In short, conviction cannot be obtained "by piling inference upon inference." Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). "That admonition . . . has special relevance in cases such as this, where many defendants, some of whom were not even acquainted, are charged on the basis of varying degrees of participation at varying times." United States v. Butler, 494 F.2d at 1252.
 
 
 127
 Nearly all of my concerns focus on problems growing out of the trial of a single grand conspiracy. There is evidence here of individual crimes and perhaps even of multiple conspiracies but, as indicated in Kotteakos v. United States, 328 U.S. at 755, 66 S.Ct. at 1243, separate conspiracy spokes may meet at a common center without the requisite conspiracy "rim of the wheel to enclose the spokes." Of necessity, my view of this case requires a burdensome restatement and examination of many of the facts (and absence thereof) as they appear to me from the voluminous record. Some orientation to the whole case is an important prelude.
 
 
 128
 The prosecution's case rested upon the theory of a single conspiracy involving continuous heroin importation from Mexico and organized wholesale and retail distribution. Mary Jo Hulsey and Barry Bolding admitted their participation in the alleged conspiracy, were granted immunity, and testified as key government witnesses. Hulsey testified she was employed by James Heath, Earl Jones, and Roger Sanders to make about 50 trips to Mexico, each time returning with heroin concealed on her body. B. Bolding, a wholesale buyer of drugs from Heath, testified about the involvement of several other defendants in the alleged conspiracy. Evidence produced at trial showed that Donald Babb, Emit Powell and Eddie Lawson, like B. Bolding, were also wholesale buyers from Heath. B. Bolding testified that both Sharon Babb and Alice Powell, wives of two alleged wholesalers, had sold him heroin on at least one occasion. Ray Richmond, Heath's nephew who lived with Heath, allegedly made pickups of heroin for Heath and assisted Heath in distribution. Tony and Ted Richardson were heroin users and allegedly bought heroin from Heath, D. Babb and E. Powell for further distribution. Deborha Hyams, the wife of a heroin distributor, allegedly delivered heroin to B. Bolding on one occasion and was apprehended by waiting police. Following a fruitless full body search, a search of a car she allegedly had driven to B. Bolding's apartment produced three ounces of heroin.
 
 
 129
 Appellants' appeal focuses on several irregularities and incidents during trial, including prosecutorial misconduct, which combined to deprive them of a fair trial. They also complain that the court erred in giving some jury instructions and refusing to give others. They attack the single conspiracy theory of the prosecution, question the sufficiency of the evidence, and claim that the trial court erred in recalling certain witnesses in an effort to cure Jencks Act violations. Deborha Hyams also contends the evidence supporting her conviction was obtained through an unlawful search and seizure and should have been excluded at trial.
 
 Prosecutorial Misconduct
 
 130
 Appellants assert that the overall activities of the government constituted prosecutorial misconduct depriving them of a fair trial. In particular, they complain that the prosecution (1) coached one of its witnesses to respond on cross-examination with an answer that effectively "harpooned" the attorney for codefendant Earl Jones, (2) unlawfully misrepresented the nonexistence of Jencks Act materials, (3) misrepresented the facts concerning inducements given to government witnesses, and (4) used an undisclosed oral confession of one defendant to cross-examine a codefendant. I believe that repeated instances of misconduct by the prosecuting attorney, whether viewed generally or in detail, compounded with the complex trial proceedings, deprived appellants of a fair trial.[2]
 
 Coaching of Witness
 
 131
 Defendants accuse the prosecution of coaching Hulsey to "harpoon" Carroll Gregg, a defense counselor representing Earl Jones. The so-called "harpoon" occurred as Gregg was cross-examining Hulsey about her dealings with drugs other than marijuana and heroin. She admitted having dealt in cocaine "(t)hat Roger Sanders also gave me one day to deliver to your office." An exchange between Hulsey and Gregg then followed in front of the jury about who told her to make that derogatory remark.
 
 
 132
 Assuming that the statement was prejudicial to any of the defendants, review of the issue by this court normally requires that defendants immediately moved for mistrial, raised an evidentiary objection, or moved to strike the testimony prior to the witness leaving the stand, with an admonition to the jury to disregard the statement. See United States v. Eaton, 485 F.2d 102, 107-08 (10th Cir. 1973); McBride v. United States, 409 F.2d 1046 (10th Cir.), Cert. dismissed, 396 U.S. 938, 90 S.Ct. 282, 24 L.Ed.2d 240 (1969). Although no objections or motions were made immediately following the above incident, at a later recess and in the absence of the jury, all defendants unsuccessfully moved for mistrial and severance. At that time the prosecutor admitted prior knowledge of this testimonial possibility and explained that he had cautioned Hulsey not to disclose that information during the government's questioning, leaving her with the discretion to reveal those facts during cross-examination.
 
 
 133
 The majority rules that the motion for mistrial made in chambers immediately following the segment of the trial in which the "harpoon" was fired was belated.
 
 
 134
 I disagree with the majority that defendants' motions for mistrial were belated. Although they did not make the motions in the presence of the jury which would have further accentuated the effect of the harpoon they made their motions in chambers at the earliest possible recess in the trial. Although the jury acquitted some defendants, convicted others, and could not agree as to still others, this court's inability to guess the impact of the improper statement upon the convicted defendants is the controlling consideration. This case is clearly distinguishable from United States v. Eaton, 485 F.2d at 102. I cannot say I "do not think the 'blurted out' reference (in this case) is a point that 'amounts to much.' " Id. at 108. Nor does the evidence as to each affected defendant overwhelmingly demonstrate his guilt. Id. Moreover, the "harpoon" here does not appear to be accidental. In a subsequent trial of several defendants who originally were parties to this trial but were granted mistrials the same government witness, Hulsey, testified on direct examination about a delivery of cocaine she made to attorney Carroll Gregg. Also, in the presence of the jury, the prosecutor himself accused Gregg of another crime involving illegal drugs. See Brief for Appellant, United States v. Jones, 578 F.2d 1332 (10th Cir. 1978). Although this misconduct occurred subsequent to the initial trial, it is evidence not of inadvertence but of a deplorable pattern of prosecutorial conduct. Without deciding whether this incident alone constituted reversible error, I am convinced the error is traceable to the prosecutor and is a major factor in the overall evaluation of prosecutorial misconduct.
 
 Jencks Act Violations
 
 135
 The majority correctly decided that the prosecution violated requirements of the Jencks Act in not timely disclosing several statements of government witnesses. The spirit and purpose of the Act cannot be circumvented by blind adherence to the technical language, "in the possession of the United States." To do otherwise would give our approval to orchestrated federal-state cooperation by which state officers investigate and develop a criminal case for federal prosecutors who then may escape the requirements of the Jencks Act by leaving these investigative records and statements in local hands.
 
 
 136
 I cannot agree, however, that the defendants are required to demonstrate prejudice resulting from the error. The Jencks Act provides that "(i)f the United States elects not to comply with an order of the court . . . the court Shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d) (1970) (emphasis added). "The prosecutor's failure to deliver the document when first requested is deemed to be an implied election not to produce." United States v. Kasouris, 474 F.2d 689, 692 (5th Cir. 1973). And "(w)here the government fails to comply with the requirements of the Jencks Act, a conviction should be reversed unless it is Perfectly clear that the defense was not prejudiced by the omission." Krilich v. United States, 502 F.2d 680, 686 (7th Cir. 1974), Cert. denied, 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 673 (1975) (emphasis in original). See United States v. Aaron, 457 F.2d 865, 869 (2d Cir. 1972). The reason for this rather strict rule is apparent:
 
 
 137
 The requirements of the Jencks Act are intended to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful. Violations of the statute are necessarily attended by the danger that this precious right will be impaired. For this reason, and also because it is ordinarily difficult upon review of a cold record to ascertain the value to the defense of a statement withheld, violation of the Act is excused only in extraordinary circumstances.
 
 
 138
 United States v. Missler, 414 F.2d 1293, 1303-04 (4th Cir. 1969), Cert. denied, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970). Although the statements were ultimately produced, the government has not shown from the record that it is Perfectly clear the defense was not prejudiced by the government's initial failure and subsequent delay.
 
 
 139
 Although the trial judge found, and the government asserts on appeal, that failure to disclose the Jencks Act material in question was inadvertent and in good faith, the government cannot exonerate itself from the penalty of the Jencks Act by pleading so-called "good faith." See United States v. Perry, 153 U.S.App.D.C. 89, 95, 471 F.2d 1057, 1063 (1972). Even if its nondisclosure may once have been characterized as mere inadvertence, the continued requests of defendants, repeated orders of the court, and consistent denials and assurances by the prosecution transferred any such inadvertence into negligent or deliberate suppression.
 
 
 140
 I recognize that violations of the Jencks Act are subject to the harmless error rule. See Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). Having concluded that the government's conduct clearly was error, it is clear the government has not met its burden of showing the error was harmless beyond reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 
 Inducements to Government Witnesses
 
 141
 Defendants further accuse the prosecution of misrepresenting facts concerning inducements given to several government witnesses, B. Bolding in particular. During discovery proceedings, in pretrial conference and at trial, the prosecutor consistently represented that the government had done no plea bargaining and had made no agreements, promises, inducements, or understandings of any kind with any of the unindicted coconspirator government witnesses. At trial, however, Andrew Coates, District Attorney for Oklahoma County, testified about two notations on a file folder containing the record of state court proceedings against B. Bolding. The first notation was read aloud to the jury as follows:
 
 
 142
 Phil Horning (Bolding's attorney) was in on Defendant Bolding. Prior to this date we had conferred with Jack Hill, Midwest City Police Department, on using Bolding on federal conspiracy charges against Vernon Heath and others. Later David Russell, U.S. District Attorney, came to this office and talked to me. He feels conspiracy charges can be made with help of Bolding. If Bolding does cooperate, testify for U.S. Government, then this charge . . . will be dismissed on Bolding.
 
 
 143
 Record, vol. 27, at 2753. When asked whether the state county attorney had "power . . . to recommend a case be dismissed and have it dismissed," Coates responded: "Yes, sir. In fact there was an agreement made prior to June 30th, which the file indicates that it must have been." Id. at 2754. Coates also answered in the affirmative when asked whether the file "reflect(s) that if (Bolding) cooperates that the case will be dismissed and a misdemeanor number there will also be dismissed." Id. Coates then read to the jury the second note on the file folder: "Duane Miller (the federal prosecutor) called wanting to know status of defendant. Did not know of the above. Wants case continued. I said it would be okay." Id.
 
 
 144
 Mr. Miller's predecessor, Mr. Russell, also testified there was an agreement between local law enforcement officers, the federal prosecutor and Bolding that if Bolding cooperated in the federal prosecution, the state prosecutor would take that into consideration and probably dismiss state charges. The evidence is undisputed that upon the request of Mr. Miller the state prosecutor agreed to continue the prosecution in state court pending Bolding's participation in this federal case. Bolding's $4,300 earnings from heroin sales, taken from him at the time of arrest, were later returned and he was supported at government expense for three weeks prior to trial. Record, vol. 23, at 723-24. He was later granted immunity on the witness stand in the presence of the jury.
 
 
 145
 Like Bolding, Hulsey was also granted immunity on the stand. Her $5,000 earnings from heroin sales, taken from her at the time of arrest, were also returned, and she was supported at government expense for approximately two to three months. Additionally, she was promised government help in relocating. Record, vol. 22, at 332.
 
 
 146
 In direct contradiction to the prosecutor's assertions and representations, several government witnesses testified about various inducements. Melody Bolding, wife of B. Bolding, testified she was promised nonprosecution in federal and state courts and government help in relocating. Record, vol. 24, at 1158-59. Johnny Hopcus testified to an understanding with local officers that by testifying in this case he could escape state charges. Id. at 1490-92. Burton Darnell testified he had made a deal with Oklahoma officials that he would not be prosecuted on several state charges if he testified. Record, vol. 25, at 1629-31. Jerry Gray testified that Officer Hill told him, Hulsey, B. Bolding and Eddie Lawson that they would have nothing to worry about if they testified. Id., at 1728-29, 1756. Eddie Lawson testified he made an agreement that neither he nor his wife would be charged in this case if he testified. Id., at 1859.
 
 
 147
 Although most of the agreements with federal prosecution witnesses were negotiated by state law enforcement officials (Officer Hill in particular), the knowledge possessed by Hill, Russell and agents of the federal prosecutor's office must be imputed to the prosecutor. United States v. Sutton, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976); See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies." United States v. Bryant, 142 U.S.App.D.C. 132, 140, 439 F.2d 642, 650 (1971). Mr. Miller's predecessor, Russell, admitted under oath that Hill was an agent of the United States Attorney's Office. Record, vol. 27, at 2868. I believe that:
 
 
 148
 In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel.
 
 
 149
 . . . And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. "The cruelest lies are often told in silence." If the police silence as to the existence of (inducements) resulted from negligence rather than guile, the deception is no less damaging.
 
 
 150
 Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964).
 
 
 151
 These rules apply to nondisclosed or falsely represented information relating to plea bargaining or other inducements to government witnesses. The Supreme Court has stated that "(w)hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule. . . . A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ..' " Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766. The Giglio Court also held that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." Id. It also explained that "(t)o the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." Id.
 
 
 152
 Since the government's case depended almost exclusively upon the testimony of B. Bolding, Hulsey and other unindicted coconspirators, their "credibility . . . was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to (their) credibility and the jury was entitled to know of it." Id. at 154-55, 92 S.Ct. at 766. As in Giglio, "the due process requirements . . . require a new trial." Id. at 155, 92 S.Ct. at 766; See United States v. Harris, 462 F.2d 1033 (10th Cir. 1972).
 
 
 153
 Failure to Disclose D. Babb's Oral Statement
 
 
 154
 Defendants complain they were prejudiced by the failure of the prosecution to disclose a pretrial, post-conspiracy statement allegedly acquired from D. Babb. The majority does not decide whether this failure was error, stating instead that prejudice to Babb or other defendants was not shown and that the error, if any, therefore cannot form a basis for a charge of prosecutorial misconduct.
 
 
 155
 It is without question that the government's failure to disclose the oral statement was error. At the time of trial, Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, as amended in 1975, required the disclosure of "any oral statement which the government intends to offer in evidence at the trial." See United States v. Taylor, 536 F.2d 1343, 1345 (10th Cir.), Cert. denied, 429 U.S. 962, 97 S.Ct. 388, 50 L.Ed.2d 330 (1976). This rule on its face applies to statements regardless of whether they are offered in the case in chief or in rebuttal.
 
 
 156
 Many defendants, in addition to D. Babb, complain they were prejudiced by the government's failure to promptly produce this oral statement. Whether prejudice was limited to Babb or not, whenever the government's failure to disclose such statements poses a serious detriment to the preparation for trial and substantially determines a defendant's defense strategy, there should be a new trial, United States v. Lewis, 167 U.S.App.D.C. 232, 511 F.2d 798 (1975), even if the statements are excluded from trial, United States v. Padrone, 406 F.2d 560 (2d Cir. 1969). As in Lewis, "(a)lthough the government presented a strong case even without the use of the statement, (I) cannot say that the error was harmless or did not prejudice (Babb and others), as use of the statement not only impeached (Babb's) credibility in general, but undermined a significant element in his defense namely that he had not been (involved in the heroin conspiracy in any way) at the time of his arrest." United States v. Lewis, 167 U.S.App.D.C. at 237, 511 F.2d at 803. The majority's belief that this statement was not prejudicial is well founded only if it can be said that showing a defendant to be a liar and destroying his primary theory of defense is not hurtful. This I am not prepared to do. The reasons for a fairly strict rule in this area are many. Knowledge of prior oral statements is critical to the preparation for trial and development of defense strategy. Defendant's memory as to exactly what occurred may well be hazy and defective given the traumatic circumstances surrounding his arrest and oral statements. Additionally, it is not every defendant who chooses to tell his own attorney all that he remembers. Knowledge of the substance of any oral statements made by defendant to police officers is a factor absolutely necessary to an accurate evaluation of whether the defendant should seek a disposition of the charges against him without trial. Finally, the existence of such statements seriously affect a defendant's decision to take the stand in defense of himself and alleged coconspirators.
 
 Single vs. Multiple Conspiracies
 
 157
 The most troubling aspect of the majority opinion is its justification for and acceptance of the government's theory of a single conspiracy. The majority's Ratio decidendi on this issue is that there was a common purpose, "the acquisition, importation and distribution of heroin," and that "(t)he efforts of each participant affected the supplies and profits of the entire enterprise." To suggest that the "affecting commerce" rationale of Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), is equally viable in conspiracy criminal law is not only a total departure from all our prior cases and without authority elsewhere, but it also sets a dangerous precedent for the development of the already overused and frequently abused doctrine of conspiracy.
 
 
 158
 That all defendants may have received heroin from a common source is not sufficient to prove a single conspiracy. The single source, vertical integration theory was criticized in Kotteakos v. United States, 328 U.S. at 773-74, 66 S.Ct. 1239, and in United States v. Butler, 494 F.2d at 1254-57. The fact that Hulsey transported from Mexico heroin which was bought and sold by various wholesale and retail distributors, does not place them all in conspiracy with each other. There may be many spokes radiating from the Hulsey hub, but, to round out the theory of one single conspiracy, there must also be a rim connecting the spokes to each other. See Kotteakos v. United States, 328 U.S. at 755, 66 S.Ct. 1239.
 
 
 159
 Evidence introduced at trial tended to prove the existence of at least two separate conspiracies. One involved sales from Hulsey and Sanders to Heath, who in turn sold to various wholesalers. The second involved sales from Hulsey and Sanders to Earl Jones, who then sold to other distributors. The indictment alleged that Heath sold to five major wholesalers: D. Babb, Earl Jones, Powell, B. Bolding, and E. Lawson. Hulsey testified that on occasion Sanders not only directed her to deliver heroin to Heath and Jones but ordered her not to tell Jones that Heath was also receiving heroin. She further testified that Jones had no idea whatsoever that Heath was receiving a portion of these Sanders-Hulsey shipments. Five other government witnesses testified about a group of wholesalers who bought directly from Heath, but none of them mentioned E. Jones. There was no evidence presented that Jones sold heroin for Heath or that Heath or any of his buyers knew of Jones' existence. The only evidence presented which would link these two conspiracies into a single common conspiracy is the fact that Hulsey and Sanders were the instrument of supply to each of them. The likely reason why the jury was unable to decide the guilt or innocence of Jones is because of this lack of proof identifying Jones with the single charged conspiracy.
 
 
 160
 "When convictions have been obtained on the theory that all defendants were members of a single conspiracy although, in fact, the proof disclosed multiple conspiracies, the error of variance has been committed." United States v. Bertolotti, 529 F.2d 149, 154 (2d Cir. 1975). See Kotteakos v. United States, 328 U.S. at 750, 66 S.Ct. 1239; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). When a variance is shown, the remaining question is which of the defendants were so prejudiced by the variance as to be entitled to a reversal of their convictions. See Berger v. United States, 295 U.S. at 82. The prejudice in such a situation is the transference of guilt from members of one conspiracy to members of another. See Kotteakos v. United States, 328 U.S. at 774, 66 S.Ct. 1239. The possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). "Numbers are vitally important in trial, especially in criminal matters." Kotteakos v. United States, 328 U.S. at 772, 66 S.Ct. at 1252. And "(w)hile defendants are easily counted, conspiracies are less readily computable." United States v. Bertolotti, 529 F.2d at 156. The number of possible conspiracies here is probably less than in Kotteakos (8) and Bertolotti (4). Nevertheless, under the single conspiracy theory the government subjected each of the eight appellants to voluminous testimony relating to unconnected crimes in which he took no part. This case is similar to Butler : at least 20 individuals were named in the indictment; different combinations of these defendants were involved in nearly every transaction which figured in the trial; and many of the defendants did not know one another prior to trial. Some of them may have purchased drugs from the same distributor. Yet because an individual may have shared mutual acquaintances in his drug business, he should not be forced to acquit himself of their actions. "One can only guess whether (any defendant) was also forced to share their guilt." United States v. Butler, 494 F.2d at 1257.
 
 
 161
 In addition to the prejudice to defendants resulting from their trial with Jones, there are also serious questions about the connection of some of the defendants with any conspiracy. As discussed above, there is little or no evidence to connect D. Hyams with either conspiracy. Ted and Tony Richardson are connected only on the hearsay testimony of a drug addict and unindicted coconspirator. Alice Powell is connected primarily because she is married to E. Powell, against whom there is much evidence of drug dealings in conjunction, and also in competition, with other defendants. Without undertaking an exhaustive review of the record to determine the sufficiency of evidence identifying each defendant with the alleged conspiracy, I believe that the potential for guilt by association demands strict adherence to our rules requiring proof of individual, not mass, guilt beyond a reasonable doubt. When as here there is both clear evidence of substantive drug violations by nearly all of the defendants and great potential for prejudice by mass trial, I would join the Second Circuit's warning to prosecutors:
 
 
 162
 In view of the frequency with which the single conspiracy vs. multiple conspiracies claim is being raised on appeals before this court, . . . we take this occasion to caution the government with respect to future prosecutions that it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. . . . (I)t has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts would be more reasonably regarded as two or more conspiracies, perhaps with a link at the top.
 
 
 163
 United States v. Sperling, 506 F.2d 1323, 1340-41 (2d Cir. 1974), Cert. denied, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). In the interest of justice and individual protection, we should require that the government cease combining in an alleged single conspiracy criminal acts which are loosely, if at all, connected.
 
 
 164
 Because of the accumulation of serious procedural errors tainting the entire trial below and the serious reservations I have about the sufficiency of the evidence both as to the existence of a single conspiracy and each defendant's participation therein, I would reverse the judgments below and remand for a new trial.
 
 
 165
 Search and Seizure of Evidence Against Deborha Hyams
 
 
 166
 The majority opinion concludes there was "probable cause for the arrest and for the search incident to the arrest," and that there was ample evidence to support the trial court's finding of consent. The consent exception to the general prohibition of warrantless searches is the only issue relevant here. Contrary to the majority's conclusion, the search of an unoccupied, locked automobile parked in a private parking lot of an apartment complex certainly cannot fall within the search incident to arrest exception when the arrest takes place within the apartment. Assuming the arrest was valid, it was "reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's person and the area "within his immediate control" construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' " United States v. Chadwick, 433 U.S. 1, 14, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) (quoting Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). However, a search "cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest.' " Id. at 15, 97 S.Ct. at 2485. Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), instructs that "(o)nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." I think it fairly safe to assume that an automobile parked at ground level at one end of an apartment complex is not within the "immediate control" of a person in a second story apartment at the opposite end of the complex. The search of defendant Hyams' car therefore cannot be justified as incident to a lawful arrest.
 
 
 167
 The moving vehicle exception to the general prohibition against warrantless searches is also inapplicable. The car was unoccupied and not on the highway. It was locked and parked, with its keys in the possession of the police. It was under the surveillance of at least four police officers and there were no exigent circumstances. The moving vehicle exception developed in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and its progeny, clearly is inapposite.
 
 
 168
 Whether the defendant voluntarily consented to the search is a question of fact, Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Wren v. United States, 352 F.2d 617, 618-19 (10th Cir. 1965), Cert. denied, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966), to be determined from the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. at 248-49, 93 S.Ct. 2041. A finding of consent is improper in the absence of "clear and positive testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given." United States v. Abbott, 546 F.2d 883, 885 (10th Cir. 1977). The finding of voluntary consent by the trial court will not be disturbed on appeal unless it is "clearly erroneous." Wren v. United States, 352 F.2d at 618-19. D. Hyams maintains the district court's finding was clearly erroneous, arguing that her consent was given in the face of coercive influences.
 
 
 169
 The presence of at least four law enforcement officers in informant Bolding's apartment provides a coercive setting. Immediately prior to signing the consent form, defendant Hyams' purse had been seized and searched and she had been subjected to the humiliating ordeal of a skin and body cavity search. It is not surprising therefore that she testified she was "scared to death" under the bombarding questions of at least four officers. She also claims the officers told her she had no choice and that they could make it harder on her. Before signing the consent form she asked to speak privately with B. Bolding. As a government agent, Bolding allegedly told her that there were narcotics present in the car and that she should sign the search waiver because the narcotics could not be used in court. Officer Hill testified that Hyams was not free to leave at any time after she entered the apartment, although she was not formally arrested. These facts all point toward something less than voluntariness.
 
 
 170
 On appeal, the government fails to cite evidence supporting the trial court's conclusion that the consent was voluntary. It certainly has not directed our attention to the "clear and positive testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given," as required by Abbott. This court has held that the number of law enforcement officers present at a search has a bearing on the finding of consent. See Harless v. Turner, 456 F.2d 1337, 1338 (10th Cir. 1972). This is especially true when, as here, the defendant is in custody. The presence of police officers in large numbers, when viewed together with their words and conduct and the advice of their agent, Bolding, makes a strong showing of coercion. In the absence of supporting evidence, the trial court's finding of voluntariness is clearly erroneous. The three ounces of heroin should properly have been suppressed and failure to do so requires reversal and a new trial as to defendant Hyams. As the majority recognizes, without this evidence there is nothing to tie Hyams to the alleged conspiracy.
 
 CONCLUSION
 
 171
 Many of the errors discussed above might be excusable if inadvertently committed by a new or inexperienced prosecutor. Such conduct is inexcusable, however, when deliberately undertaken by an experienced prosecutor. As in Berger v. United States, 295 U.S. at 89, 55 S.Ct. at 633, "we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect . . . which cannot be disregarded as inconsequential." Indeed, the cumulative effect requires reversal and a new trial in order to afford defendants the kind of trial guaranteed by the Due Process Clause of the Fifth Amendment.
 
 
 
 [1]
 We recognize that there is authority to the contrary. Courts in several circuits have indicated that a statement in the hands of local police is not a statement in the possession of the federal prosecutor within the meaning of the Jencks Act. See United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976) (dicta); United States v. Smith, 433 F.2d 1266 (5th Cir. 1970), Cert. denied, 401 U.S. 977, 91 S.Ct. 1206, 28 L.Ed.2d 328 (1971); Beavers v. United States, 351 F.2d 507 (9th Cir. 1965) (but court held the material in question was not a "statement" within the meaning of the Act and that Jencks was inapplicable anyway); United States v. Harris, 368 F.Supp. 697, 708-9 (E.D.Pa.1973), Aff'd, 498 F.2d 1164 (3d Cir.), Cert. denied, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974)
 At least under the circumstances of this case there was close cooperation between state and local officers and the federal prosecutor. Where the prosecutor, in his statements to the court, assumed the responsibility for obtaining any statements in the possession of state officers, the government could not subsequently disclaim responsibility for failure to disclose.
 
 
 [1]
 Of the 20 individuals named in the indictment, three pleaded guilty before trial and two were fugitives during trial. During the course of the trial two defendants were acquitted and the jury was unable to reach a verdict as to five others
 
 
 [2]
 Appellants' inability to obtain a fair trial resulted in large part from the complex and confusing interplay of multiple attorneys and questionable prosecutorial practices. It does not flow from any lack of conscientious effort by the trial judge to control the otherwise unmanageable trial proceedings. The task of hearing and sorting out evidence as to 15 separate defendants, with 16 attorneys examining, cross-examining, and reexamining nearly every witness, is almost beyond the capacity of any judge and jury and, where possible, ought to be avoided